LOGIXX AUTOMATION, INC. and Laser Products, Inc., Plaintiffs–Appellees,

v.

LAWRENCE MICHELS FAMILY TRUST and Estate of Lawrence Michels, Defendants–Appellants.

No. 01CA1222.

Colorado Court of Appeals, Div. II.

Sept. 12, 2002.

Markusson, Green & Jarvis, P.C., James K. Green, Denver, Colorado, for Plaintiffs–Appellees.

Gorsuch Kirgis, L.L.P., Dudley P. Spiller, Ellen E. Stewart, Denver, Colorado, for Defendants–Appellants.

Opinion by Judge TAUBMAN.

In this dispute involving a covenant not to compete and the design and manufacture of machinery used to make illuminated signs, defendants, the Lawrence Michels Family Trust and the Estate of Lawrence Michels (Michels), appeal the judgment entered on a jury verdict in favor of plaintiffs, Logixx Automation, Inc. and Laser Products, Inc. (companies), for breach of contract and conspiracy. We affirm and remand for an award of the companies' attorney fees associated with this appeal.

## I. Background

At issue in this case is a product called the Preformer, a machine that automates the production of neon signs made of metal letters called "returns." It includes three components: an uncoiler, a roll former, and a notcher. These three components manipulate metal sheets into the form of letters for signs. The notcher component includes a computer software package.

During the 1990s, the companies designed, built, marketed, sold, and leased the Preformer, distributing forty-four of them. The product's sales price was approximately $150,000 per unit.

In the early 1990s, Lawrence Michels joined the boards of directors of the companies, serving until 1995. He, among others, including another member of the boards, subsequently filed an involuntary Chapter 11 bankruptcy proceeding against the companies. The companies opposed the bankruptcy proceeding on the basis that they did not owe Michels and the other board member

any money and that they were not insolvent. The companies also filed a complaint against Michels and the other board member for business interference.

Michels, the other board member, and the companies ultimately settled the bankruptcy dispute in February 1996. In return for the companies' purchase of their stock, Michels and the other board member signed a covenant not to compete. As pertinent to this appeal, the covenant not to compete included the following terms:

> (b) He, she or it shall not, for a period of three (3) years from the date of Closing:
>
> . . .
>
> (iv) engage, directly or for hire, as a proprietor, stockholder, partner, director, officer, employee, independent contractor or otherwise, design, build, sell, distribute or market any:
> (I)    roll forming machine for metal fabrication;
> (II)   bending machine for bending random shapes and random sizes in metal fabrication;
> (III)  bending machine for neon tubes;
> (IV)   creasing machine for metal fabrication;
> (V)    software directly competitive with the "Logixx Programmer"; or
> (VI)   software of any kind incorporate [sic] "Roman curves."

The settlement agreement also prohibited Michels from influencing any employees of the companies to leave their employment to work for a competitor and from using any confidential information from the companies. The agreement also required that Michels return to the companies all confidential information related to the Preformer.

In March 1996, Michels and the other board member formed a partnership that eventually developed a machine called the "Return Shop," which utilized computer software to cut notches in sheet metal to make signs. It also included other components that bent and facilitated uncoiling the metal. The Return Shop was distributed through Arete Corporation, a company formed by Michels and the other board member. The Return Shop was significantly smaller than

the Preformer and sold for approximately $60,000 per unit. Arete began selling the Return Shop in 1998.

In 1999, the companies filed this suit against Arete and Michels, alleging, among other things, breach of the settlement agreement. In 2000, the companies filed an amended complaint alleging (1) conspiracy to violate the settlement agreement and misappropriate trade secrets and (2) misappropriation of trade secrets. After a lengthy trial, a jury found Michels liable for breach of contract and conspiracy and awarded $1,170,000 in lost profits to the companies. The jury found Arete not liable on the misappropriation of trade secrets claim. The trial court awarded $559,287.24 in statutory prejudgment interest. The parties stipulated to an award of $290,000 in attorney fees to the companies, subject to this appeal. The trial court also awarded costs to the companies in the amount of $22,445.

This appeal followed.

## II. Evidentiary Support for Damages Award

Michels' principal contention is that the companies did not provide a reasonable basis for the computation of damages and that the evidence was too speculative to support the damages awarded. Specifically, Michels contends that the evidence did not provide an adequate basis for the jury to determine *net* profits. We disagree.

■ The fact finder has the sole prerogative to assess the amount of damages, and its award will not be set aside unless it is manifestly and clearly erroneous. *Sonoco Prods. Co. v. Johnson*, 23 P.3d 1287 (Colo.App.2001).

However, a damage award may not be based on speculation or conjecture. *Wojtowicz v. Greeley Anesthesia Servs., P.C.*, 961 P.2d 520 (Colo.App.1997).

■ The breach of a covenant not to compete gives rise to damages for a purchaser's loss of profits attributable to the breach. *DBA Enters., Inc. v. Findlay*, 923 P.2d 298 (Colo.App.1996).

■ However, a claim for profits may not be sustained by evidence that is speculative, remote, imaginary, or impossible of ascertainment. Damages for lost profits are measured by the loss of net profits, meaning net earnings or the excess of returns over expenditures, not lost gross profits or gross sales revenues. *Wojtowicz v. Greeley Anesthesia Servs., P.C., supra; see also Lee v. Durango Music*, 144 Colo. 270, 355 P.2d 1083 (1960)(profits means net earnings, or the excess of returns over expenditures, and relates to any excess which remains after deducting from the returns the operating expenses, depreciation of capital, and interest on the capital employed); *Black's Law Dictionary* 1227 (7th ed.1999)(net profits means "[t]otal sales revenue less that cost of the goods sold and all additional expenses").

■ When recovery of lost net earnings is sought, it is sufficient for the plaintiff to provide a reasonable basis for computation, using the best evidence obtainable under the circumstances that will enable the trier of fact to arrive at a fairly approximate estimate of the loss. Evidence of past performance may form the basis for a reasonable prediction of future profits. *Airborne, Inc. v. Denver Air Ctr., Inc.*, 832 P.2d 1086 (Colo. App.1992).

However, there is no per se rule requiring a showing of past profits. *See Western Cities Broad., Inc. v. Schueller*, 849 P.2d 44 (Colo.1993)(plaintiff had no history of prior profitability and had never operated at a profit under its present ownership; court declined to adopt a per se rule requiring a showing of past profits); *Cope v. Vermeer Sales & Serv., Inc.*, 650 P.2d 1307, 1309 (Colo.App.1982)("[a]lthough a plaintiff seeking to enter evidence of loss of profits in a newly established business does not have a 'prior track record' to ground a claim upon, this does not create a 'per se' exclusion of such loss if other competent evidence is proffered").

■ Documentary evidence of profit loss is preferred, but damages may be determined based on testimony by the plaintiff or other witnesses. *Roberts v. Holland & Hart*, 857 P.2d 492 (Colo.App.1993).

██ Furthermore, damages are not recoverable for losses beyond an amount that a plaintiff can establish with reasonable certainty by a preponderance of the evidence. Thus, the plaintiff must submit substantial evidence, which together with reasonable inferences to be drawn therefrom, provides a reasonable basis for computation of the damages. *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378 (Colo.1993).

██ However, despite difficulty or even uncertainty in ascertaining damages with mathematical precision, the trier of fact must, by utilizing all the evidence and the reasonable inferences therefrom, devise a fair method for assessing such damages. *Peterson v. Colo. Potato Flake & Mfg. Co.*, 164 Colo. 304, 435 P.2d 237 (1967).

██ Once the fact of damage has been established with the requisite degree of certainty, uncertainty as to the amount of damages will not bar recovery. *Sonoco Prods. Co. v. Johnson, supra; see also Power Equip. Co. v. Fulton*, 32 Colo.App. 430, 513 P.2d 234 (1973)(plaintiff testified as to the costs of his business and his gross sales, and from this testimony, the jury could arrive at a net profit figure).

Finally, guided by a presumption favoring the validity of the jury's findings, we review the record for evidence to sustain the verdict. *See Varcoe v. Form & Pour Co.*, 480 P.2d 591 (Colo.App.1971)(not published pursuant to C.A.R. 35(f)); *see also City of Aurora v. Loveless*, 639 P.2d 1061, 1063 (Colo. 1981)("[j]ury verdicts will not be reversed for inconsistency if a reading of the record reveals any basis for the verdicts"; court's task "is to examine the record and determine whether there was competent evidence from which the jury could have logically reached the verdict in this case").

Our review of the record reveals sufficient evidence from which the jury could determine the lost net profits.

██ First, the companies' expert testified that each sale of the Return Shop was a sale lost to the companies. The evidence demonstrated that by September 1999, Michels had sold fifty-four Return Shops. Accordingly, the jury could have concluded that by 1999, the companies could have sold an additional fifty-four Preformers. At a selling price of $150,000 per unit, the jury could have determined that the companies lost $8.1 million in gross sales.

Second, an expert in lost profit analysis testified extensively for the companies about the amount of Arete's "net bottom line profits." Evidence regarding Arete's projected net bottom line profits was also available to the jury in Arete's business plan, which documented a thirty-one to forty-one percent net profit margin for certain fiscal years and indicated these profit margins were similar to those of other companies in the automation industry. The president of the companies similarly testified that the companies operated at a thirty-five to forty percent profit margin.

Generally, it may be preferable to establish lost net profits by providing the jury with the complaining company's financial statements detailing costs and expenses. Here, however, because there was evidence that the companies had never made a profit because of initial research and development costs, and their sales had decreased once Michels began developing the Return Shop, the jury could have reasonably determined the companies' lost profits by considering testimony regarding Arete's net profits. Also, the measure of the companies' lost profits was supported by testimony of its president, as well as by testimony concerning Arete's net profits. Accordingly, we cannot conclude that the evidence was too speculative, remote, imaginary, or impossible of ascertainment to support the jury's verdict.

Furthermore, Michels' reliance on *Lee v. Durango Music, supra,* is misplaced. Unlike here, in *Lee* one plaintiff testified only to his lost *gross* profits, and this figure did not include expenses.

Finally, Michels contends that the damages amount is erroneous because it includes future damages. To support this contention, Michels states that the companies' expert projected damages to the year 2008, nine years past the expiration of the settlement agreement. However, we conclude that sub-

stantial evidence supported the jury's award without considering such future damages.

### III. Limiting Damages Because of Bankruptcy Proceeding

Michels contends that the trial court erred by not limiting damages as a result of the bankruptcy proceeding. Relying on *Gibson v. Eberle*, 762 P.2d 777 (Colo.App.1988), Michels contends that a covenant not to compete becomes unenforceable once the business that is protected by the noncompete clause has ceased operations. Consequently, Michels argues, because Logixx filed for bankruptcy in April 2000 and ceased operations in November 2000, the trial court should have limited damages to those occurring before its cessation of business. We disagree.

As stated above, there was ample evidence from which the jury could have determined that the companies suffered the damages awarded as of September 1999 when Michels had sold fifty-four Return Shops. Further, while there was conflicting evidence presented, some testimony indicated that Logixx was still an ongoing business at the time of trial.

Under these circumstances, we conclude the trial court did not err in allowing the jury's damage award to stand.

### IV. Allocation of Damages to Each Plaintiff

Michels next contends that the trial court erred when it divided the damages equally between Logixx and Laser. The companies argue that any error in apportioning the verdict between the two companies was harmless. We agree with the companies.

Michels has not shown how he was prejudiced by the trial court's apportionment of damages. Michels is responsible for payment of the entire verdict regardless of the apportionment. In this situation, only the companies could have objected to the equal apportionment of the damages, and the record reflects that they agreed to it. Thus, we reject Michels' contention. *See Leek v. City of Golden*, 870 P.2d 580 (Colo.App.1993)(a trial court judgment will not be reversed unless the errors complained of are shown to prejudice the substantial rights of the complaining party).

### V. Prejudgment Interest

Michels contends that the trial court erred as a matter of law in awarding prejudgment interest. We disagree.

First, Michels argues that the damages awarded do not fall within § 5–12–102(1)(b), C.R.S.2001, because they are consequential damages and not money or property "wrongfully withheld." We disagree.

In cases other than personal injury tort actions, a prevailing party may recover prejudgment interest under § 5–12–102(1), C.R.S.2001:

> Except [in certain tort actions], when there is no agreement as to the rate thereof, creditors shall receive interest as follows:
>
> (a) When money or property has been wrongfully withheld, interest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property from the date of wrongful withholding to the date of payment or to the date judgment is entered, whichever first occurs; or, at the election of the claimant,
>
> (b) Interest shall be at the rate of eight percent per annum compounded annually for all moneys or the value of all property after they are wrongfully withheld or after they become due to the date of payment or to the date judgment is entered, whichever first occurs.

In *Mesa Sand & Gravel Co. v. Landfill, Inc.*, 776 P.2d 362, 365–66 (Colo.1989), the supreme court determined that the phrase "wrongfully withheld" is ambiguous and held that § 5–12–102(1)(b) is to be given a broad, liberal construction to effectuate the legislative purpose of compensating parties for the loss of money or property to which they are entitled.

In *Westfield Development Co. v. Rifle Investment Associates*, 786 P.2d 1112 (Colo. 1990), the supreme court awarded prejudgment interest on lost profits associated with a tortious interference with contract claim. *Cf.*

*South Park Aggregates, Inc. v. Northwestern Nat'l Ins. Co.,* 847 P.2d 218 (Colo.App.1992)(refusing to award prejudgment interest on an entire award of compensatory damages and only awarding interest on the amount of damages that reflects the benefit to plaintiff under the contract).

In light of this precedent, we conclude that the trial court properly awarded prejudgment interest on the full damages amount, which reflected the total of lost net profits the companies would have realized but for breach of the settlement agreement.

Nevertheless, Michels argues that the prejudgment interest was excessive because the damages award was improperly based on future damages. While we agree that a trial court may not award prejudgment interest on future damages, there was evidence in the record from which the jury could have determined the damages award without considering future damages. *See Curragh Queensland Mining Ltd. v. Dresser Indus., Inc.,* —— P.3d ——, ——, 2002 WL 725656 (Colo.App. No. 00CA1049, Apr. 25, 2002)("prejudgment interest is allowed only on past, not future, losses").

■ Finally, Michels contends that the trial court erred in awarding prejudgment from March 31, 1996, even though no damages occurred until 1998 when the first Return Shop was sold. We disagree.

■ A nonbreaching party is entitled to recover prejudgment interest from the time of the breach. *Mesa Sand & Gravel Co. v. Landfill, Inc., supra.*

Here, the trial court concluded that the breach occurred in March 1996. This finding is supported by evidence in the record that in March 1996, Michels and the other board member formed the partnership under which they developed the Return Shop. Thus, we conclude that the trial court did not err.

## VI. Covenant Not to Compete

Michels next contends that the settlement agreement is unenforceable because it contains an overbroad covenant not to compete. We conclude that, as applied to this case, the covenant not to compete is not overly broad.

■ The interpretation of a contract is a matter of law, which we review de novo. *State Farm Mut. Auto. Ins. Co. v. Stein,* 940 P.2d 384, 387 (Colo.1997).

■ Covenants not to compete are disfavored in Colorado, and exceptions to the general rule are narrowly construed. *Nat'l Propane Corp. v. Miller,* 18 P.3d 782 (Colo. App.2000).

■ Here, the covenant not to compete was not overly broad as it applied to the Preformer and the Return Shop product lines and the market area of sign manufacturing. It specifically identified the functions of the machine (roll forming, metal uncoiling and bending, and related software) and the prohibited activities (design, sell, build, distribute, or market).

Michels contends that the agreement is overly broad because it could be construed to apply to other areas of manufacturing, such as the airline and automobile industries. However, we decline to speculate as to whether the agreement would be overly broad in a different setting because, here, Michels marketed the Return Shop as a direct competitor to the Preformer in the same market area—manufacturing illuminated signs.

## VII. Economic Loss Rule

Michels contends that the conspiracy claim is barred by the economic loss rule and that the trial court erred in ruling otherwise. We conclude any error was harmless.

■ In *Town of Alma v. Azco Construction, Inc.,* 10 P.3d 1256 (Colo.2000), and its companion case, *Grynberg v. Agri Tech, Inc.,* 10 P.3d 1267 (Colo.2000), the supreme court expressly adopted the economic loss rule in Colorado to maintain a distinction between contract and tort law. The essential difference between tort and contract obligations is the source of the parties' duties. Tort obligations arise from duties imposed by law and are designed to protect all citizens from the risk of physical harm to their persons or to their property. These duties are imposed by law without regard to any agreement or contract. In contrast, contract obli-

gations arise from promises made between parties. Contract law is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining. *Town of Alma v. Azco Constr., Inc., supra.*

■ The economic loss rule provides that a party suffering only economic loss from the breach of an express or implied contract may not assert a tort claim for such a breach absent an independent duty of care under tort law. *Town of Alma v. Azco Constr., Inc., supra.* Accordingly, the companies cannot maintain a conspiracy claim associated with the breach of contract unless an independent duty of care exists.

■ Here, in effect, the companies argue that because Michels, was a party to the settlement agreement, he had an independent duty not to enter into a civil conspiracy with another party to the contract to breach the contract, particularly when the alleged coconspirator was a former board member of the companies.

Under *Azco,* our analysis focuses on whether Michels had an independent duty not to conspire to breach a contract with another signatory to that contract. *See Grynberg v. Agri Tech, Inc., supra* (the focus in an analysis under the economic loss rule is on the source of the duties alleged to have been breached). If he did, the conspiracy charge was not barred by the economic loss rule. However, if no independent duty existed, then under the economic loss rule, the conspiracy claim was invalid.

■ As discussed below, we conclude that a conspiracy to breach a contract claim cannot be maintained when the two parties alleged to have participated in the conspiracy are signatories to the contract. Therefore, Michels had no independent duty not to conspire to breach the settlement agreement with another signatory to that agreement. Thus, the conspiracy claim is barred by the economic loss rule, and the trial court erred by submitting this claim to the jury.

The parties agree that no case law in Colorado has addressed whether there can be a conspiracy by two or more parties to a contract to breach that contract.

In *Nelson v. Elway,* 908 P.2d 102, 106 (Colo.1995), the supreme court addressed the elements of civil conspiracy in conjunction with the tort of breach of fiduciary duty: "To establish a civil conspiracy in Colorado, a plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result."

However, the court did not address a civil conspiracy claim in conjunction with a breach of contract claim where the only damages alleged were for breach of contact.

In *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 28 Cal. Rptr.2d 475, 869 P.2d 454, 459 (1994), the California Supreme Court considered a conspiracy to interfere with a contact claim, rather than a conspiracy to breach a contract claim, and concluded that a contracting party only owes a duty to perform the contract according to its terms. After discussing the differences between contract and tort law, as the Azco court did, it refused to expand tort liability in a way that obliterated "vital and established distinctions between contract and tort theories of liability by effectively allowing the recovery of tort damages for an ordinary breach of contract." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd., supra,* 28 Cal.Rptr.2d 475, 869 P.2d at 457. Based on this analysis, the court concluded that a party could not conspire to interfere with his or her own contract.

We find this analysis persuasive and conclude that because the only duty a contracting party owes is to perform the contract according to its terms, a contracting party has no independent duty not to conspire to breach its own contract with another signatory to that contract. Accordingly, we conclude that there can be no conspiracy by two or more parties to a contract to breach that contract.

This conclusion has also been reached by courts in other jurisdictions and is supported by the policy considerations announced in *Azco* and *Grynberg. See Harris v. Equitable Life Assurance Soc'y,* 147 F.Supp. 478 (D.Iowa 1957); *Callahan v. Gutowski,* 111

A.D.2d 464, 488 N.Y.S.2d 519 (N.Y.App.Div. 1985).

The companies urge us to follow cases from other jurisdictions that have applied civil conspiracy tort liability to breach of contract cases. However, these cases are inapposite either because one of the conspiring parties was a stranger to the contract or because the court found an independent duty based on a special relationship such as a partnership. *See Nat'l Linen Serv. Corp. v. Clower*, 179 Ga. 136, 175 S.E. 460 (1934); *Sorenson v. Chevrolet Motor Co.*, 171 Minn. 260, 214 N.W. 754 (1927); *Boyles v. Thompson*, 585 S.W.2d 821 (Tex.App.1979); *Fox v. Deese*, 234 Va. 412, 362 S.E.2d 699 (1987).

Nevertheless, the companies contend that Michels had an independent duty to engage in good faith business practices that prohibit a prior board member of a corporation from interfering with the corporation's business relations. However, we need not address this issue because the companies did not allege the tort of interference with business relations in their complaint.

Moreover, although Colorado courts have recognized that some special relationships, such as attorney-client, physician-patient, and insured-insurer, by their nature automatically trigger an independent duty of care that supports a tort action even when the parties also have a contractual relationship, the relationship between a former board member and the corporation is not so recognized. *See, e.g., Town of Alma v. Azco Constr., Inc., supra* (collecting cases where special relationship created independent duty); *Colo. Homes, Ltd. v. Loerch–Wilson*, 43 P.3d 718 (Colo.App.2001)(recognizing a duty imposed on a builder, independent of any contract, to construct a home without latent defects for the benefit of subsequent purchasers).

■ In any event, as the companies argue, any error in allowing the conspiracy claim to go to the jury was harmless because the damages the jury awarded to the compa-

nies were supported by evidence related to the breach of contract claim.

Here, the jury verdict form allowed the jury to find Michels separately liable for the breach of contract and conspiracy claims without determining the damages associated with each claim. We cannot tell from this jury verdict form how much the jury awarded for breach of contract and how much for conspiracy. Although Michels submitted a jury verdict form that would have allowed the jury to make a separate damages determination for each claim, the trial court rejected this form.

Nevertheless, the record reflects that the only evidence of damages presented by the companies was for lost profits related to the breach of contract claim. The companies did not argue in closing that they were entitled to any damages under the conspiracy claim beyond their request for lost profits under the breach of contract claim. Further, the trial court instructed the jury that if it found Michels liable on more than one claim, it could not award duplicative damages. Accordingly, under these circumstances, Michels was not prejudiced by the jury's consideration of the conspiracy claim.

The judgment is affirmed. The case is remanded to the trial court to determine and award the attorney fees associated with this appeal to which the companies are entitled.

Judge DAILEY and Judge PLANK * concur.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2001.