132 H N.M. 733

2002-NMCA-101

55 P.3d 429

**Jack CAMPBELL, Plaintiff–Appellant,**

v.

**MILLENNIUM VENTURES, LLC,
Defendant–Appellee.**

**No. 22,073.**

Court of Appeals of New Mexico.

Aug. 2, 2002.

Seth V. Bingham, Alice Tomlinson Lorenz, Miller, Stratvert & Torgerson, P.A., Albuquerque, NM, for Appellant.

Joseph E. Manges, Comeau, Maldegen, Templeman, & Indall, LLP Santa Fe, NM, for Appellee.

## OPINION

FRY, Judge.

{1} In this case we decide several issues of first impression concerning an employer's purported assignment of an employee's non-competition agreement. Plaintiff Jack T. Campbell signed a written employment agreement that included an arbitration provision. Shortly thereafter, Campbell's employer sold most of its assets to Defendant Millennium Ventures, LLC (Millennium) pursuant to the terms of an asset purchase agreement. Campbell filed a complaint for declaratory judgment requesting a determination that Millennium was not a party to the employment agreement. In response, Millennium requested and obtained summary judgment determining that Millennium was entitled to enforce the employment agreement, including the arbitration provision, against Campbell. On appeal, Campbell argues that the employment agreement was not assignable and, even if it were, the purchase agreement did not validly assign the employment agreement. We affirm.

## BACKGROUND

{2} In September 1998, Campbell entered into the employment agreement with Schreiber Insurance Agency, Inc. (Agency). The employment agreement stated that Campbell would sell insurance on behalf of Agency and that either party could terminate the agreement, with or without cause, with thirty days written notice.

{3} Sections 5 and 6 of the employment agreement primarily benefitted Campbell. Section 5 granted Campbell a "vested equity interest" in the insurance business he produced during his employment. Section 5 reads, in relevant part:

In the event of the Employee's retirement, termination of employment or death, whichever occurs first, the Employer agrees to pay to the Employee or [his beneficiary] the Employee's vested equity interest in the ... insurance accounts the Employee sold while employed by the Employer. The Employer shall make an initial down payment of twenty-five [percent] (25%) of the amount due under this paragraph within 30 days of termination, retirement or death, with the balance payable monthly over five (5) years.... In exchange for this guaranteed purchase, the Employee agrees to the non-disclosure and non-solicitation constraints and conditions set forth below.

Section 5 also set out a vested equity payout formula based upon years of service and the amount of annual commissions Campbell earned. Section 6 promised the vested equity payout set forth in Section 5 "in the event that the Employer shall discontinue operating its business." Section 6 also provided that "this contract shall remain binding upon the Employer's successors and the Employee."

{4} Sections 11 and 12 of the employment agreement served to benefit Agency. Section 11, entitled "Non–Solicitation Agreement," read in part:

The Employee covenants ... that for a period of three (3) years from and after the termination of employment with the Employer, however such termination occurs, the Employee shall not, directly or indirectly ... solicit, attempt to solicit, or accept any insurance business ... from any customer or account on the books of the Employer at the time Employee's em-

ployment shall terminate, or within twelve (12) months prior thereto, or from any person ... or corporation [who] has been solicited on behalf of the Employer at any time during the twelve (12) months prior to the termination of the Employee's employment. . . .

Section 12 provided monetary damages for breach of Section 11 including the costs and attorney's fees incurred to enforce this provision.

{5} Sections 16 and 18 were general provisions addressing the law governing the employment agreement and the employment agreement's binding effect. Section 16 required "[a]ll disputes under this agreement [to] be arbitrated pursuant to the rules of the American Arbitration Association and the prevailing party [to] be entitled to payment of their reasonable attorney's fees and costs." Section 18 provided that the "Agreement shall inure to the benefit of and shall be binding upon the parties, their successors, assigns, or personal representatives; however, the Employee may not transfer or assign Employee's obligations under this Agreement."

{6} About a month after Campbell signed the employment agreement, F. Don Schreiber, president of Agency, negotiated with Millennium for the sale of his insurance business. During negotiations, Millennium sent a letter to Schreiber memorializing the parties' initial negotiations, including a stipulation that Campbell "enter into a new non-compete agreement with our agency, similar to [his] existing agreement with [Agency]" and that the "interests of ... Jack Campbell in [his] books of business with [Agency] will be satisfied by [Agency]." Schreiber's response acknowledged that "Jack [is] free to do as [he] wish[es] at the time of sale. [He] may quit or stay, sign or not. I have no control on what [he does] past point of sale. [He is] bound by the existing agreement as respects [his] business, only. I will encourage [him] to stay, but that is all I can do."

{7} In December 1998, Millennium and Agency entered into the purchase agreement for the purchase and sale of "substantially all of [the] assets" of Agency for $540,000 plus accounts receivable. The provisions of the purchase agreement are discussed in detail below.

{8} After the purchase was complete, Agency paid Campbell approximately $103,000 for his vested equity interest in his accounts pursuant to the formula set out in Section 5 of the employment agreement. Agency paid Campbell additional amounts over the next few months for the accounts sold to Millennium in accordance with the vesting schedule set forth in Section 5.

{9} Campbell worked for Millennium until mid-January 1999, when he resigned, alleging that Millennium had refused to honor the terms of the employment agreement. Campbell began working for a competitor of Millennium and began soliciting some of the customers he had served while employed by Agency. Millennium argued that Campbell's actions breached the non-solicitation provisions found in Section 11 of the employment agreement, while Campbell argued that Millennium's prior breach of the employment agreement barred Millennium from enforcing the terms of the employment agreement.

{10} Millennium filed a demand for arbitration seeking money damages for Campbell's alleged violations of the non-solicitation provisions of the employment agreement. Campbell, initially believing that Agency had transferred the employment agreement at the time it sold the assets, submitted to arbitration and counterclaimed that Millennium had breached the employment agreement. When subsequent discovery revealed the actual wording of the purchase agreement, Campbell concluded that Millennium had *not* validly acquired the employment agreement because Millennium was an assignee, not a successor in interest. Campbell then filed a complaint for declaratory judgment and a motion for summary judgment in district court seeking a determination that the employment agreement was an unassignable personal services contract and that Millennium was not a party to and did not and could not acquire any rights in the employment agreement by virtue of the purchase agreement.

{11} Millennium answered and filed a cross motion for summary judgment seeking

dismissal of Campbell's declaratory judgment complaint and referral of the matter to arbitration. As grounds for the motion, Millennium claimed that it had purchased the employment agreement when it purchased Agency's assets and the employment agreement required arbitration of any disputes regarding its terms.

{12} The court entered summary judgment for Millennium, finding that the parties intended the employment agreement to be assignable and that it was assigned to Millennium through the purchase agreement. The court stayed arbitration pending the outcome of this appeal.

## DISCUSSION

### Standard of Review

■ {13} The parties dispute the applicable standard of review. Relying on *Fernandez v. Farmers Insurance Co.*, 115 N.M. 622, 626, 857 P.2d 22, 26 (1993), Millennium maintains that abuse of discretion is the proper standard of review. However, *Fernandez* reflects the standard for reviewing the merits of an arbitrator's decision, not the standard for reviewing the decision of a district court on the question whether a dispute is subject to arbitration. Our case law makes it clear that "the threshold issue of whether there was an existing agreement requiring arbitration is a matter for the court, not the arbitrator." *Gonzales v. United Southwest Nat'l Bank*, 93 N.M. 522, 523, 602 P.2d 619, 620 (1979); *see also Bernalillo County Med. Ctr. Employees' Ass'n v. Cancelosi*, 92 N.M. 307, 308, 587 P.2d 960, 961 (1978) (stating "[w]here provision for arbitration is disputed, the court's function is to determine whether there is an agreement to arbitrate"). Thus, the trial court correctly undertook to decide whether the parties had agreed to arbitrate their dispute. Millennium also argues that the issue of whether the employment agreement is assignable should be left to arbitration. However, until the validity of the assignment is established, there is nothing for the arbitrator to arbitrate. *Gonzales*, at 523, 602 P.2d at 620.

{14} The court found that the employment agreement was valid and assigned to Millennium in the purchase agreement, and thus the arbitration agreement was enforceable.

The court's order granting summary judgment and compelling arbitration disposed of all issues brought in the action, and it is therefore ripe for review. *See Corn v. N.M. Educators Fed. Credit Union*, 119 N.M. 199, 202, 889 P.2d 234, 237 (Ct.App.1994) (stating when no issues remain to be decided by the court, case is ripe for review) *overruled on other grounds by Trujillo v. City of Albuquerque*, 1998–NMSC–031, ¶ 32, 125 N.M. 721, 965 P.2d 305. The standard of review on summary judgment is de novo. *See Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. Because the parties agree that the material facts are not in dispute, "[t]he issue on appeal is whether [Defendant] was entitled to [judgment] as a matter of law." *Id.*

### Standard for Interpreting the Employment Agreement and the Purchase Agreement

■ {15} "Interpretation of an unambiguous contract is a question of law which we review de novo." *Nearburg v. Yates Petroleum Corp.*, 1997–NMCA–069, ¶ 7, 123 N.M. 526, 943 P.2d 560; *see also Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781–82, 845 P.2d 1232, 1235–36 (1993). We consider the documents as a whole to determine how they should be interpreted. *Nearburg,* 1997–NMCA–069, ¶ 8, 123 N.M. 526, 943 P.2d 560. We can consider the circumstances surrounding the creation of the contract as well as the contract itself. *See Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000–NMSC–033, ¶ 13, 129 N.M. 698, 12 P.3d 960 (holding that the court can look to extrinsic evidence to determine whether an ambiguity exists and to resolve any ambiguities found); *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 508–09, 817 P.2d 238, 242–43 (1991) ("[I]n determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." (footnote omitted)). Campbell has conceded that in order to interpret the employment agreement and the purchase agreement, we must rely primarily upon documen-

tary evidence. Therefore, we are in as good a position as the trial court to interpret these documents and to determine their legal effect on the parties. *Nearburg,* 1997–NMCA–069, ¶ 8, 123 N.M. 526, 943 P.2d 560.

### The Employment Agreement Was Assignable

{16} We first consider whether the employment agreement was assignable. If the employment agreement was unassignable for any reason, any attempt to assign it in the purchase agreement would have been futile. Campbell argues that the terms of Section 6 of the employment agreement establish that he never consented to assignment. He also argues that the employment agreement was unassignable because it was a personal services contract, and consequently, assignment would have been a restraint of trade.

#### *Campbell Consented to Assignment*

{17} Although this is an issue of first impression in New Mexico, other jurisdictions have held that an employee consents to assignment of an employment agreement if the agreement expressly binds and benefits successors or assigns. *See, e.g., Saliterman v. Finney,* 361 N.W.2d 175, 178 (Minn.Ct. App.1985) (holding that an employment agreement was assignable due to clause "bind[ing] the successors if any in interest to the parties") (internal quotation marks omitted); *cf. Perthou v. Stewart,* 243 F.Supp. 655, 658–59 (D.Or.1965) (determining that employment contracts are of a personal nature and not assignable if they contain no language allowing assignment or binding assigns and successors); *Phillips v. Corporate Express Office Prods., Inc.,* 800 So.2d 618, 619–20 (Fla.Dist.Ct.App.2001) (explaining that the term "successor or assign" or similar language is needed to indicate employee's agreement to transfer).

{18} Campbell contends that he did not consent to assignment of the employment agreement because Section 6 of the employment agreement, which provides for payment of an employee's vested equity interest, binds only "successors" and not "assignees." However, Section 18 of the employment agreement binds successors *and* assigns. Camp-

bell contends that the language of Section 18 should be ignored in light of the more specific language of Section 6. We disagree. Section 6 addresses only the employee's equity interest. Here, Millennium is seeking to enforce the non-solicitation and arbitration provisions of the employment agreement, which are found in Sections 11 and 16. The obligations and benefits found in these Sections are assignable pursuant to Section 18 of the employment agreement which benefits and binds "successors [and] assigns" of the parties to the "Agreement." Thus, Campbell consented to the assignment of Sections 11 and 16 and the employment agreement as a whole by agreeing to language contained in Section 18. Although Campbell contends that he never intended to consent to such assignment, his contentions are not persuasive in light of the clear language of Section 18 of the employment agreement. *See Ponder,* 2000–NMSC–033, ¶ 14, 129 N.M. 698, 12 P.3d 960 (holding that a party's statement of unilateral subjective intent without more will not establish an ambiguity in light of clear contractual language).

{19} Moreover, Section 6 applies only in the event "the Employer" ceases operation of the business and obligates "the Employer" to make the payments described in Section 5 to Campbell. Therefore, the "successors" provision of Section 6 would be triggered only if "the Employer" failed to make the payments promised to Campbell in that section. Here, Campbell received these payments in accordance with the vesting schedule set forth in Section 5. Even though Agency, not Millennium, made the initial $103,000 payment to Campbell, Agency made this payment *after* receiving $455,000 from Millennium for purchase of "goodwill" and Millennium, acknowledging that Campbell was entitled to these payments, expressly conditioned its acceptance of the purchase agreement on Agency's agreement to make these payments. Thus, the "successors" provision of Section 6 never came into play.

#### *A Personal Services Contract May Be Assigned With Consent*

{20} Campbell contends that assigning the employment agreement and the non-

solicitation clause would have constituted an impermissible restraint of trade because the employment agreement was an unassignable personal services contract. We assume without deciding that the employment agreement was a personal services contract. However, we conclude that personal services contracts are assignable with consent and, as addressed above, Campbell consented to assignment of the employment agreement in Section 18 of the employment agreement.

{21} Campbell has not directed us to any case in which a court refused to enforce an employment contract, even if it was considered to be a personal services contract, when the agreement contained language indicating consent to the assignment. By contrast, many cases have held to the contrary. *See, e.g., Pino v. Spanish Broad. Sys. of Fla., Inc.,* 564 So.2d 186, 189 (Fla.Dist.Ct.App. 1990) (holding that the language "transferable or assignable" plus ratification by continued employment was sufficient for valid assignment); *Orkin Exterminating Co. v. Burnett,* 259 Iowa 1218, 146 N.W.2d 320, 327 (Iowa 1966) (explaining that an executory contract for personal services is assignable if the contract so provides or the party consents to or ratifies the assignment). The only cases refusing to enforce assignment involve contracts lacking the requisite consent. *See, e.g., Sisco v. Empiregas, Inc.,* 286 Ala. 72, 237 So.2d 463, 466–67 (1970) (concluding that an employment contract was an unassignable personal services contract because it lacked assigning language); *Phillips,* 800 So.2d at 619–20 (refusing to enforce a non-competition clause because the employment contract was a personal contract without language indicating that the employee was agreeing to any transfer); *SDL Enters., Inc. v. DeReamer,* 683 N.E.2d 1347, 1350 (Ind.Ct.App.1997) (holding that covenants not to compete between a former employee and former owner could not be assigned to a subsequent purchaser because neither the former employee nor the owner had consented to such assignment); *All–Pak, Inc. v. Johnston,* 694 A.2d 347, 351 (Pa.Super.Ct.1997) (holding that, in the absence of the employee's express or implicit consent to the assignment, restrictive covenants in an employment contract are not assignable).

{22} New Mexico case law does not suggest any policy reasons for prohibiting the assignment of personal services contracts. Indeed, our courts have previously acknowledged that reasonable restrictive covenants in an employment agreement are acceptable even if the covenants restrain trade or competition to some degree. *See Manuel Lujan Ins., Inc. v. Jordan,* 100 N.M. 573, 577, 673 P.2d 1306, 1310 (1983) (upholding agreement precluding a former employee from soliciting or accepting business from his former employer's customers for two years after employment terminated); *Lovelace Clinic v. Murphy,* 76 N.M. 645, 652, 417 P.2d 450, 454 (1966) (upholding provision in employment contract barring physician from practicing medicine in Bernalillo County for three years after he terminated his employment). Although these types of covenants have a tendency to eliminate or restrict competition and may operate to compel an employee to remain in the employ of an employer, "these are legitimate purposes, so long as the restrictions are reasonable." *Id.* at 650, 417 P.2d at 453. Consequently, we are persuaded that personal services contracts that include non-solicitation clauses may be assigned with the consent of the parties to the assignment.

*Campbell Did Not Preserve His Argument Regarding Material Alteration of the Agreement's Terms*

{23} Campbell also contends that the assignment was invalid because it increased the risks and burdens to Campbell by changing the nature of the employment relationship. Campbell claims the assignment adversely affected his rights to commission and deferred compensation, increased competition among agents, and "put [him] in the position of working for one man he did not get along with and three people he did not know."

{24} Millennium maintains that Campbell failed to preserve this argument because he did not explicitly raise it below. We agree that Campbell's arguments to the trial court contained no discussion of the character of his employment with Millennium and no sug-

gestion that the assignment materially affected his commission rights or exposure to risk. Campbell argued only that the employment agreement was unassignable as a personal services contract. Therefore, we decline to review the argument he now makes for the first time. *See Woolwine v. Furr's, Inc.,* 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App. 1987) ("To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court.").

### The Purchase Agreement Assigned the Employment Agreement

{25} Campbell contends that, even if he consented to assignment of the employment agreement in general, the assignment was invalid because the purchase agreement did not specifically identify the employment agreement as one of the assets being purchased. We review the language of the purchase agreement and the surrounding circumstances to determine whether the purchase agreement included the employment agreement. *See Benton v. Albuquerque Nat'l Bank,* 103 N.M. 5, 10, 701 P.2d 1025, 1030 (Ct.App.1985) (explaining that an assignment may be informal "so long as the language utilized, coupled with the surrounding circumstances, reveals an intent by the owner to transfer a present interest in [subject property]"). An assignment need only "describe the subject matter with sufficient particularity to render it capable of identification." *Id.*

{26} The following provisions of the purchase agreement are relevant to this issue. The "whereas" section provides that seller desires to sell and buyer desires to purchase, "substantially all of [the seller's] assets." Section 1 provides that "Seller agrees to sell and Buyer agrees to buy the assets, except those excluded under Section [5]." Section 5 excludes specific assets, but does not list the employment agreement as an excluded asset. Section 2 sets out the "assets to be purchased" and does not include the employment agreement, but does list "goodwill" with an assigned value of $455,000.

{27} We are not aware of any New Mexico cases addressing whether the purchase and sale of the goodwill of a business should be interpreted as including the purchase and sale of an employment agreement with a non-solicitation clause when that employment agreement is not explicitly included in a list of the assets purchased. However, this Court has recognized the connection between non-competition agreements and goodwill. In *Mitchell v. Mitchell,* 104 N.M. 205, 211, 719 P.2d 432, 438 (Ct.App.1986), we noted that a buyer often seeks to purchase a covenant not to compete in order to preserve the goodwill of the business being purchased. In addition, our Supreme Court has recognized the importance of goodwill in the insurance business because that business, by nature, depends upon personal contacts and relationships, and "[s]ales result primarily because of the goodwill built by the agent." *Bowen v. Carlsbad Ins. & Real Estate, Inc.,* 104 N.M. 514, 517, 724 P.2d 223, 226 (1986). Courts sanction such restraints on competition because of the importance of goodwill in business purchases. *See id.; Alexander & Alexander, Inc. v. Danahy,* 21 Mass.App.Ct. 488, 488 N.E.2d 22, 29 (1986) (enforcing a covenant not to compete, noting that goodwill is of great importance in the insurance brokerage business because customers tend to rely on key personnel who have previously provided quality service).

{28} Courts in other jurisdictions have held that the sale of goodwill implicitly includes the sale of an employment agreement. *See Torrington Creamery, Inc. v. Davenport,* 126 Conn. 515, 12 A.2d 780, 783 (1940) (holding that employee's non-compete clause was a valuable asset of the business such that when the owner sold all of its assets and goodwill, the owner was deemed to have assigned as much of the employment contract "as is severable and necessary for the protection of the business sold to the purchaser" even though the sales contract never mentioned the employment agreement); *J.H. Renarde, Inc. v. Sims,* 312 N.J.Super. 195, 711 A.2d 410, 413 (Ch. Div.1998) ("Upon the sale of a business a restrictive covenant made in connection with such sale is assignable without express words to that effect and passes as an incident of the business sold even

though not specifically assigned." (internal quotation marks and citation omitted)). By contrast, Campbell has not cited and we have not found any case expressly supporting his view that the sale of goodwill is insufficient to assign an employment agreement.

{29} The cases Campbell does cite in support of his theory are distinguishable. For example, in *Alldredge v. Twenty–Five Thirty–Two Broadway Corp.*, 509 S.W.2d 744, 749 (Mo.Ct.App.1974), although the court held that the employment agreement was not assigned to the purchaser of the assets, the sales contract had no assignment provision and the employment contract contained no language indicating consent or mentioning successors and assigns. In *Jenson v. Olson*, 144 Mont. 224, 395 P.2d 465 (1964), the court found the assignment to be unenforceable due to lack of evidence that the subsequent purchaser even knew of the non-competition covenant when he purchased the assets. *Id.* at 468. Here, there is no dispute that Millennium knew of Campbell's employment agreement because the employment agreement is mentioned in the letters between Schreiber and Millennium.

{30} Campbell cites *Benton* in support of his theory that New Mexico does not recognize assignments by implication. However, in *Benton* we recognized the validity of the assignment as long as the language of the assignment and the surrounding circumstances "reveal[ ] an intent by the owner to transfer a present interest in the [subject property]." 103 N.M. at 10, 701 P.2d at 1030. "The meaning of an assignment is to be determined with reference to the intention of the drafter at the time the agreement was made." *Id.*

{31} Campbell contends the circumstances surrounding the purchase agreement support the conclusion that the parties did not contemplate inclusion of the employment agreement in the purchase agreement. However, the only evidence of pre-contract negotiations—the letters between Millennium and Schreiber—refutes Campbell's argument. These letters reflect the understanding of both Millennium and Schreiber that Campbell's existing employment agreement impacted the purchase. They acknowledged that Campbell was "bound by the existing agreement as respects [his] business, only."

{32} Campbell also argues that, because the purchase agreement specifically required a non-competition agreement by Schreiber, the failure to mention the employment agreement signified an intent to exclude the employment agreement from assignment. However, Schreiber's non-competition agreement was specific to, and did not pre-exist, the purchase agreement, and it is therefore distinguishable from Campbell's employment agreement which was a pre-existing asset of the insurance agency.

{33} Moreover, logic suggests that the goodwill sold included the employment agreement. Millennium paid $455,000 for Agency's "goodwill" which would be rendered worthless if the two agents identified with Agency were free to solicit the very customers they had previously contacted on behalf of Agency. *See Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276, 437 N.Y.S.2d 646, 419 N.E.2d 324, 328–29 (1981) (holding that an implied covenant precludes seller from approaching his former customers and attempting to regain their patronage once he has purported to transfer their goodwill to his purchaser).

{34} In summary, the fact that the employment agreement was not listed in the purchase agreement as an excluded asset, the circumstances surrounding the purchase agreement, and the reasonable meaning of "goodwill" persuade us that the purchase agreement included assignment of the employment agreement. Because of this resolution, we need not address Campbell's arguments regarding ratification and equity. We hold the trial court properly determined that the employment agreement's arbitration clause was enforceable.

**Attorney Fees**

{35} Pursuant to the employment agreement, Millennium argues that it is entitled to its attorney fees and costs if it prevails in this appeal. We disagree. The issue of attorney fees and costs is a subject for the arbitration proceeding. *See Winrock Inn Co. v. Prudential Ins. Co.*, 1996–NMCA–113,

¶¶ 30–32, 122 N.M. 562, 928 P.2d 947 (holding that a court may not issue a ruling on an issue parties have agreed to arbitrate); *K.L. House Constr. Co. v. City of Albuquerque*, 91 N.M. 492, 494, 576 P.2d 752, 754 (1978) (explaining that a court only performs an initial screening process to determine whether parties have agreed to submit the subject matter under dispute to arbitration; once court determines that there is an agreement to arbitrate, the court should order arbitration).

### Rules Violation

{36} We note that Campbell's reply brief exceeded the page limit imposed by Rule 12–213(F) NMRA 2002. Although the rule states that "the argument portion of the reply brief shall not exceed fifteen double-spaced typewritten pages," we construe "the argument portion" to include any text in the reply brief, even if the party filing the brief titles the text something other than "argument." *See* Rule 12–213(A)(2)–(4), (B), and (C) (indicating that the rule contemplates that reply briefs shall not contain any summary of proceedings or summary of facts and shall consist only of tables and arguments).

{37} In addition, Campbell's reply brief was printed in ten-point typeface, which is a smaller typeface than permitted by Rule 12–305(B) NMRA 2002. We understand there may be confusion due to the difference between "type style" and "typeface" and the "pitch" and "point" referenced in the rule. We now clarify that "pitch" and "type style" refer to text created by a typewriter, and "point" and "typeface" refer to text created by a computer or other printing mode.

## CONCLUSION

{38} We affirm the trial court's order of summary judgment.

{39} IT IS SO ORDERED.

WE CONCUR: RICHARD C. BOSSON, Chief Judge, and JAMES J. WECHSLER, Judge.