**PHOENIX CAPITAL, INC. and Phoenix Analytic Services, Inc., Plaintiffs–Appellants and Cross–Appellees,**

v.

**Robert M. DOWELL, Defendant–Appellee and Cross–Appellant.**

No. 05CA2712.

Colorado Court of Appeals, Div. V.

July 26, 2007.

Certiorari Denied Feb. 19, 2008.

837

Horowitz Forbes, LLP, Peter C. Forbes, Denver, Colorado; Dean Neuwirth, P.C., Dean Neuwirth, Denver, Colorado, for Plaintiffs–Appellants and Cross–Appellees.

Kamlet Shepherd & Reichert, LLP, Barry A. Schwartz, Denver, Colorado, for Defendant–Appellee and Cross–Appellant.

Opinion by Judge DAILEY.

Plaintiffs, Phoenix Capital, Inc. (PCI) and Phoenix Analytic Services, Inc. (PAS), appeal the trial court's order (1) denying their motion to preliminarily enjoin defendant, Robert M. Dowell, from violating a noncompetition agreement and (2) denying injunctive relief against Dowell beyond a one-year time limit specified in a nonsolicitation agreement. Dowell cross-appeals the trial court's order preliminarily enjoining him from violating the nonsolicitation agreement for the remainder of the specified period. We affirm in part, vacate in part, and remand with directions.

## I. Background

PCI is an investment bank that provides analytic and brokerage assistance to financial institutions and investors who buy, sell, and manage certain servicing rights associated with large pools of mortgages. Those servicing rights—to collect mortgage payments, taxes, and interest on residential mortgages and then to remit these proceeds to the mortgage holder—exist independently of the underlying mortgage obligations themselves.

PCI initially employed Dowell as a senior portfolio analyst. In 2000, Dowell signed an agreement with PCI, under which he was prohibited, in the event he left PCI's employ, from competing with PCI or soliciting its customers or employees for one year. The agreement provided that it was binding and would "inure to the benefit of the parties, and [PCI's] successors and assigns."

By 2002, Dowell was the head of PCI's analytics division. Subsequently, PCI formed PAS as an independent company to undertake its analytical functions and transferred Dowell to manage the analytics division at PAS.

In forming PAS, PCI executed a transfer agreement which provided, in pertinent part, that, at closing, PCI would "sell, transfer, assign, and deliver to PAS, all the properties, assets, goodwill, and business of every kind and description, both real and personal, tangible and intangible, of the analytic services division, as set forth on *Schedule 1* ('the Assets')." (Emphasis in original.) PCI's employment agreements were not listed on Schedule 1; nor, for that matter, was anything else.

In March 2005, Dowell resigned from PAS to join one of PCI's competitors in forming a new company. According to PCI and PAS (collectively, Phoenix), he began to actively solicit PCI's clientele, assist his new company in competing with PCI for brokerage work, and try to convince two of PAS's key employees to join his new company.

Phoenix instituted the present action, seeking injunctive relief to enforce, and damages for past violations of, the noncompetition and nonsolicitation provisions in Dowell's employment agreement.

After a hearing, the trial court determined that Phoenix was entitled to preliminary injunctive relief only with respect to the nonsolicitation provisions in the employment agreement.

The trial court determined that Phoenix had not established a reasonable probability of success on the merits and thus was not entitled to relief with respect to the noncompetition provision because (1) Dowell, at the time he signed the agreement, was not "professional staff to executive [or] management personnel" within the meaning of § 8-2-113(2)(d), C.R.S.2006, and thus, the noncompetition provision was void ab initio; and (2) the void ab initio provision could not be given effect when, subsequently, Dowell attained a prominent managerial position with PCI and PAS.

The trial court ruled that Phoenix was, however, entitled to enforce the provisions addressing nonsolicitation of customers and employees because, consistent with *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 796 (Colo.App.2001), *abrogated in part on other grounds by Ingold v. AIM-*

*CO/Bluffs, L.L.C. Apartments*, 159 P.3d 116, 124 (Colo.2007), Phoenix had voluntarily agreed to limit the scope of those provisions to only "active" efforts to solicit clients or employees.

Pursuant to C.A.R. 1(a)(3), Phoenix and Dowell each appeal those aspects of the trial court's preliminary injunction ruling that were adverse to their respective interests.

## II. Preliminary Injunction Standards

■ "The granting or denial of a preliminary injunction does not amount to an adjudication of the ultimate rights in controversy. In granting a preliminary injunction, the court should not attempt to do what can be done only after a full hearing and final decree." *Litinsky v. Querard*, 683 P.2d 816, 819 (Colo.App.1984) (citation omitted). Thus, findings made by a trial court after a preliminary injunction hearing are not determinative of the ultimate merits of the case. *Carroll v. Stancato*, 144 Colo. 18, 354 P.2d 1018 (1960).

■ Preliminary injunctions protect plaintiffs from sustaining irreparable injury while preserving the trial court's ability to render a meaningful decision following a trial on the merits. A preliminary injunction is not warranted, however, unless the trial court finds that the moving party has demonstrated each of the following six factors: (1) the moving party has a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury exists that may be prevented by injunctive relief; (3) the moving party has no plain, speedy, and adequate remedy at law; (4) the granting of a preliminary injunction will not disserve the public interest; (5) the balance of equities favors granting the injunction; and (6) the injunction will preserve the status quo pending a trial on the merits. *Rathke v. MacFarlane*, 648 P.2d 648, 653–54 (Colo. 1982); *see Bloom v. Nat'l Collegiate Athletic Ass'n*, 93 P.3d 621, 623 (Colo.App.2004).

In the present case, neither side presents an argument about the last five of the *Rathke* factors. Instead, both Phoenix's appeal and Dowell's cross-appeal turn on the trial court's assessment of the first factor, that is, wheth-

er Phoenix has shown a reasonable probability of success on the merits.

We review a trial court's grant or denial of a preliminary injunction for abuse of discretion. Under that standard, we examine the court's ruling to determine whether it is based on an erroneous application of the law, or is otherwise manifestly arbitrary, unreasonable, or unfair. *Bloom v. Nat'l Collegiate Athletic Ass'n, supra,* 93 P.3d at 623.

### III. The Noncompetition Provision

Phoenix contends that the trial court erred in ruling that it had not established a reasonable probability of success on its request to enforce the noncompetition provision. We disagree.

"Covenants not to compete, with some narrow exceptions, are contrary to the public policy of Colorado and are void." *DBA Enters., Inc. v. Findlay,* 923 P.2d 298, 302 (Colo.App.1996). In the preliminary injunction context, the employer has the burden to establish that the covenant not to compete falls within one of those narrow exceptions. *See Porter Indus., Inc. v. Higgins,* 680 P.2d 1339, 1341 (Colo.App.1984).

As pertinent here, § 8–2–113(2)(d) provides that the prohibition on covenants not to compete "shall not apply to ... [e]xecutive and management personnel and officers and employees who constitute professional staff to executive and management personnel."

Here, the trial court denied Phoenix's request for a preliminary injunction because it found that Phoenix had not established a reasonable probability that, at the time Dowell signed the agreement, he fell within "the statutory exception for professional staff."

Phoenix asserts that the trial court erred in two respects. First, it asserts the applicability of the exception contained in § 8–2–113(2)(d), is determined not as of the time Dowell signed the agreement in 2000, but, rather, as of the time he left PAS's employ in 2005, when he was a manager. Second, it asserts that, even if the applicability of the exception is determined as of the time Dowell signed the agreement, he was, even at that time, "professional staff to executive and management personnel." We are unpersuaded.

#### A. Operative Date of the Covenant

Three divisions of this court have interpreted § 8–2–113, C.R.S.2006, to mean that "a covenant which restricts the *right* of a person to receive compensation for work performed for any employer is void *ab initio,*" "rather than voidable." *Management Recruiters of Boulder, Inc. v. Miller,* 762 P.2d 763, 765 (Colo.App.1988); *accord In re Marriage of Fischer,* 834 P.2d 270, 272 (Colo. App.1992); *Colo. Accounting Machs., Inc. v. Mergenthaler,* 44 Colo.App. 155, 156–57, 609 P.2d 1125, 1127 (1980).

A covenant or provision that is void ab initio is "[n]ull from the beginning, as from the first moment when a contract is entered into." *Black's Law Dictionary* 1568 (7th ed.1999) (defining "void ab initio"); *see City & County of Denver v. Bd. of County Comm'rs,* 661 P.2d 1185, 1187 (Colo.App.1982)(equating void ab initio with void, and stating, "The meaning of the term void is 'null, ineffectual, nugatory.' A 'void' judgment, for example, is one which 'has neither life nor incipience.'" (citation omitted) (quoting *Black's Law Dictionary* and *Davidson Chevrolet, Inc. v. City & County of Denver,* 138 Colo. 171, 175, 330 P.2d 1116, 1118 (1958)) ).

Under C.A.R. 35(f), the trial court was obliged to follow the decisions in *Management Recruiters of Boulder, Inc. v. Miller, supra, In re Marriage of Fischer, supra,* and *Colorado Accounting Machines, Inc. v. Mergenthaler, supra.* Consequently, we perceive no abuse of the trial court's discretion in concluding, consistent with those decisions, that the validity of a noncompetition provision is determined as of the time the agreement is entered into, and not as of any time thereafter.

In reaching this result, we necessarily reject Phoenix's reliance on the supreme court's decision in *Shepler v. Whalen,* 119 P.3d 1084, 1088 (Colo.2005), in which the court noted that the phrase "shall be void" in the statute governing "conveyances to defraud creditors" had "been interpreted [in

prior case law] to mean that the conveyance is voidable." In the present case, we deal with a statute, § 8–2–113, which has been consistently interpreted for over twenty-five years in the manner relied upon by the trial court. And we perceive no persuasive reason to abandon or decline to follow that line of authority. *Cf. Smith v. Dist. Court,* 907 P.2d 611, 612 (Colo.1995)("Considerations of uniformity, certainty, and stability, which are the objectives of the stare decisis doctrine should govern court decisions of this state." (citation omitted) ).

Nor are we persuaded by Phoenix's assertion that adhering to the decisions of those divisions leaves employers unprotected from employees who, while not qualifying as personnel as described in § 8–2–113(2)(d) when they enter into employment contracts, are later promoted to key positions in the company. An employer may always enter into new employment agreements as its employees take on additional responsibilities, and the employer, rather than the employee, has the obligation to protect the employer's best interests.

Thus, as the trial court found, the determinative question is whether, in 2000, Dowell was "professional staff to executive and management personnel."

### B. Professional Staff to Executive and Management Personnel

The trial court preliminarily found that Dowell did not fall within the "professional staff" provision because, although he reported to managers and executives, most of them doubled as salespersons and eighty to ninety percent of Dowell's work was performed in support of the sales staff, rather than in support of executive or management functions.

Ordinarily, "[t]he determination of whether an employee is executive or management personnel, or professional staff, is a question of fact for the trial court," *Management Recruiters of Boulder, Inc. v. Miller, supra,* 762 P.2d at 765, and we will not disturb the trial court's determination unless it is so clearly erroneous as to find no support in the record. *See generally Tiger v.*

*Anderson,* 976 P.2d 308, 310–11 (Colo.App. 1998) (discussing standard for appellate court review of trial court's findings of fact). However, our use of the clear error standard of review is premised upon the trial court's having correctly applied the law in making its findings of fact, and we review de novo the trial court's application of the law. *See People in Interest of J.R.T.,* 55 P.3d 217, 219 (Colo.App.2002), *aff'd sub nom. People v. Martinez,* 70 P.3d 474 (Colo.2003).

Here, Phoenix asserts that the trial court's factual determination is marred by an erroneous understanding of the meaning of the phrase "professional staff to executive and management personnel." We disagree.

The General Assembly did not define the phrase "professional staff to executive and management personnel," and in only two instances have our appellate courts expounded upon the meaning of the phrase. In *Boulder Medical Center v. Moore,* 651 P.2d 464 (Colo. App.1982), a division of this court refused to exclude physicians from "professional staff" because "professional employees" had been defined in case law as "such persons as legal, engineering, scientific and medical personnel together with their junior professional assistants." *Boulder Med. Ctr. v. Moore, supra,* 651 P.2d at 465 (quoting *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 284 n. 13, 94 S.Ct. 1757, 1767, 40 L.Ed.2d 134 (1974)). And in *Smith v. Sellers,* 747 P.2d 15, 17 (Colo.App. 1987), the division, citing *Webster's Third New International Dictionary* 2219 (1986), defined "staff" as "the personnel responsible for the functioning of an institution or the establishment or the carrying out of an assigned task under an overall director or head."

Phoenix does not disagree that "professional staff" would include legal, engineering, scientific, and medical personnel, as well as their junior professional assistants, who are responsible for the functioning of an institution or the establishment or the carrying out of an assigned task under an overall director or head. But Phoenix asserts the "professional staff" exception is broad enough to encompass persons who, like Dowell, are highly skilled in their respective areas and report to managers or executives.

When construing a statute, a court must ascertain and give effect to the intent of the General Assembly and refrain from rendering a judgment that is inconsistent with that intent. To determine legislative intent, we look first to the words of the statute. *State v. Nieto,* 993 P.2d 493, 500 (Colo.2000). Unless the words have acquired a technical or particular meaning by legislative definition or otherwise, they are given effect according to their commonly understood and accepted usage. *See* § 2–4–101, C.R.S.2006; *Nat'l Farmers Union Prop. & Cas. Co. v. Estate of Mosher,* 22 P.3d 531, 533 (Colo.App.2000).

If the words used are clear and unambiguous in import, we apply the statute as written. *State v. Nieto, supra,* 993 P.2d at 500. If, however, the words are ambiguous or unclear, such that "the words chosen do not inexorably lead to a single result," we may consider, among other things, the legislative declaration, the object sought to be attained, and the consequences of a particular construction. *State v. Nieto, supra,* 993 P.2d at 501. Ultimately, a statute must be construed to further the legislative intent represented by the entire statutory scheme. *State v. Nieto, supra,* 993 P.2d at 501.

Here, the commonly accepted meaning of the term "professional" is, as Phoenix argues, broader than simply a member of a "learned profession." *See Webster's, supra,* at 1811 (defining the adjective "professional" as "engaged in one of the learned professions or in an occupation requiring a high level of training and proficiency ...: characterized by or conforming to the technical or ethical standards of a profession or an occupation: manifesting fine artistry or workmanship based on sound knowledge and conscientiousness: reflecting the results of education, training, and experience").

Thus, we readily perceive that, by education and experience, a person may be considered to be a "professional," and that, in that sense, Dowell may well have been a "professional" member of PCI's staff in 2000. However, Dowell reported to persons who held management or executive positions but who, for the most part, related to him in a nonmanagement or nonexecutive capacity. Thus, the issue, in our view, is whether he was "staff to executive and management personnel."

The statute is silent with respect to the type of interaction, in terms of quality or quantity of time, a person must have with management or executive personnel to qualify as "professional staff *to executive and management personnel.*" Section 8–2–113(2)(d) (emphasis added).

After assessing the text and legislative history of the statute, one set of Colorado commentators has concluded that the purpose underlying the exception contained in § 8–2–113(2)(d) is "to protect employers from the disruption of operations which occur upon the loss of a key executive or member of his staff." James H. Krendl & Cathy S. Krendl, *Noncompetition Covenants in Colorado: A Statutory Solution?,* 52 Den. L.J. 499, 532 (1975). In this regard, another commentator has noted, "By allowing employers to require executive and management personnel and their professional staff to sign noncompetition agreements, the statute assures employers that the very heart of their enterprise—business plans and high-level strategies—will not be subject to accidental (or intentional) disclosure to a competitor." Christine M. O'Malley, *Covenants Not to Compete in the Massachusetts Hi–Tech Industry: Assessing the Need for a Legislative Solution,* 79 B.U. L.Rev. 1215, 1236 (Dec.1999)(footnote omitted).

In accord with this purpose, we conclude that the phrase "professional staff to executive and management personnel" is limited to those persons who, while qualifying as "professionals" and reporting to managers or executives, primarily serve as key members of the manager's or executive's staff in the implementation of management or executive functions.

This construction of the statutory phrase comports with (1) the public policy of Colorado disfavoring covenants not to compete, *see DBA Enters., Inc. v. Findlay, supra,* 923 P.2d at 302 ("Covenants not to compete ... are contrary to the public policy of Colorado ...."); and (2) the requirement that the exceptions under the statute be nar-

rowly construed. *See Logixx Automation, Inc. v. Lawrence Michels Family Trust,* 56 P.3d 1224, 1230 (Colo.App.2002)(exceptions to the general rule against covenants not to compete are narrowly construed); *Nat'l Propane Corp. v. Miller,* 18 P.3d 782, 787 (Colo. App.2000)(same).

 In this case, we discern nothing in the trial court's ruling that departs from our understanding of the "professional staff" exception. The issue was whether, in 2000, Dowell's relationship to PCI's managers and executives was such that he primarily served as a key member of their staff in the implementation of management or executive functions. In light of the trial court's preliminary finding that eighty to ninety percent of Dowell's work was in a sales (rather than a management) support role, we perceive no abuse of discretion in the trial court's preliminary conclusion that he was unlikely to have had the type of access to, or involvement in, management or executive decisions that would bring him within the "professional staff" category of employees against which a noncompetition provision could be enforced.

Consequently, we uphold the trial court's determination that Phoenix had not shown a reasonable probability of success with respect to this claim.

### IV. Nonsolicitation Provisions

Phoenix contends that the trial court erred in not extending the length of time in which the nonsolicitation provisions could be in effect beyond the one-year period specified in the employment agreement. In his cross-appeal, however, Dowell contends that the trial court erred in finding that the nonsolicitation provisions were enforceable at all against him. We disagree with Phoenix, but agree in part with Dowell.

### A. Phoenix's Contention: Extending the Nonsolicitation Provisions

 The trial court preliminarily ruled that the nonsolicitation provisions were only enforceable for the period set forth in the provision itself (that is, one year from the termination of Dowell's employment in March 2005). In so ruling, the trial court

was, again, following precedential authority from this court. *See Atmel Corp. v. Vitesse Semiconductor Corp., supra,* 30 P.3d at 796 ("Injunctive relief based on a restrictive employment agreement must be co-extensive with the terms of the contract.").

Phoenix, however, argues that (1) *Atmel* is distinguishable; (2) *Atmel* is of questionable validity, inasmuch as it relies on two unpublished cases; and (3) the supreme court has never embraced the *Atmel* limitations on a court's authority to grant injunctive relief.

We do not read *Atmel* as narrowly as Phoenix would wish, that is, to apply only in cases where a "past alleged wrong" violated a temporary restraining order (TRO). In *Atmel,* the division was concerned with violations of the *underlying agreements,* not with the violations of the TRO. In addition, it was the improper use of a future injunction to remedy past violations of the underlying agreements the division ruled improper. *See Atmel Corp. v. Vitesse* that *Semiconductor Corp., supra,* 30 P.3d at 796.

Similarly, we do not view the *Atmel* division's reliance on unpublished cases as a reason, in and of itself, for questioning *Atmel's* viability. Further, although the supreme court may not have embraced the *Atmel* time limitation, it has also not rejected it. And at least one other division of this court has followed it, *see Employment Television Enters., LLC v. Barocas,* 100 P.3d 37, 44–45 (Colo.App.2004) ("the trial court should reconsider the scope of the injunction in light of the terms of the purchase agreement"), and we do likewise here.

Consequently, we discern no error in the trial court's refusing to extend the terms of the preliminary injunction beyond the one-year term specified in the parties' agreement.

### B. Dowell's Contentions

Dowell contends that the nonsolicitation provisions are unenforceable because (1) the accompanying noncompetition provision is not enforceable; (2) his employment contract was a personal services contract which could not be assigned; (3) PAS did not qualify as an entity to which his employment contract

could be assigned; and (4) there was, in any event, insufficient evidence of assignment from PCI to PAS. We agree with Dowell's first assertion, insofar as it relates to his agreement not to solicit Phoenix's customers; however, we reject his assertions insofar as they relate to his agreement not to solicit Phoenix's employees.

### 1. Effect of Accompanying, Unenforceable Noncompetition Provision

#### a. Provision Prohibiting Solicitation of Employees

■ Initially, we reject Dowell's assertion that, as a matter of law, an agreement not to solicit a former employer's employees cannot be enforced when an accompanying noncompetition provision is determined to be invalid. Where a nonsolicitation provision is limited to prohibiting only initiating contacts or "active" solicitation of the employer's employees, it is enforceable, despite the invalidity of an accompanying noncompetition provision. *See Atmel Corp. v. Vitesse Semiconductor Corp.*, *supra*, 30 P.3d at 796.

#### b. Provision Prohibiting Solicitation of Customers

■ The *Atmel* division did not discuss the validity of an agreement not to solicit the employer's customers when an accompanying noncompetition provision is invalid. In our view, there is no legal basis to enforce an agreement not to solicit customers, where § 8–2–113(2) would invalidate an agreement not to compete.

This follows because an agreement not to solicit customers is a form of an agreement not to compete. *See* John R. Paddock, Jr., *Colorado Employment Law and Practice* § 5.30, at 249 (2d ed.2005) (agreements prohibiting employees from competing for existing customers are "precisely the type" of noncompetition agreements encompassed by § 8–2–113(2)); *see also Management Recruiters of Boulder, Inc. v. Miller*, *supra*, 762 P.2d at 764–65 (invalidating under § 8–2–113(2) a clause prohibiting the solicitation of customers because it "would have had the effect of restricting [the former employee]

from working for another employer in the recruitment business").

With respect to covenants not to solicit customers, we reject the applicability of the *Atmel* distinction between active and passive solicitation efforts. The core policy underlying the unenforceability of noncompetition provisions is a prohibition on the restraint of trade or, as pertinent here, the right to make a living. In order to make a living, the former employee needs to be free to solicit (actively or passively) former customers, as long as he or she does not use the employer's trade secrets to do so. *See* § 8–2–113(2)(b), C.R.S.2006 (recognizing the validity of contracts for the protection of trade secrets); *see, e.g., Colo. Supply Co. v. Stewart*, 797 P.2d 1303, 1306–07 (Colo.App.1990) (analyzing customer lists as trade secrets). In contrast, an agreement not to solicit employees would not impair the former employee's ability to make a living.

In the trial court, Phoenix initially alleged, but then determined not to pursue, a claim of improper use of trade secrets by Dowell. Because, as Phoenix conceded in its opening brief, this appeal does not present any issues relating to trade secrets, we perceive no legal basis upon which to distinguish the unenforceable noncompetition agreement from the agreement not to solicit Phoenix's customers.

#### c. Conclusion

We conclude that, although the invalidity of the noncompetition provision did not render invalid Dowell's agreement not to solicit Phoenix's employees, it rendered invalid Dowell's agreement not to solicit Phoenix's customers. Thus, the trial court erred in preliminarily enjoining Dowell from soliciting Phoenix's customers, but not from actively soliciting its employees.

### 2. Personal Services Contract

■ Dowell correctly points out that generally Colorado law "does not allow assignments for matters of personal trust or confidence, or for personal services." *Roberts v. Holland & Hart*, 857 P.2d 492, 495 (Colo.App.1993). Setting aside the issue of whether noncompetition and nonsolicitation agreements are assignable independently of

the employment contracts in which they appear, *see Cantrell v. Lemons,* 119 Colo. 107, 111, 200 P.2d 911, 912–13 (1948) (noncompetition provisions are assignable), Colorado law recognizes an exception to the rule against assigning personal services contracts, where the employee consents to the assignment. *See Matson v. White,* 122 Colo. 79, 84, 220 P.2d 864, 866 (1950); *see also Campbell v. Millennium Ventures, LLC,* 132 N.M. 733, 55 P.3d 429, 435 (Ct.App.2002)(discussing case law on the subject).

Assuming that Dowell's employment contract would qualify as a personal services contract—an issue we do not decide—we nonetheless conclude that he consented to its assignment when he assented to the part of the employment agreement that said the "Agreement shall be binding upon and shall inure to the benefit of the parties, and [PCI's] successors and assigns." *See Pino v. Spanish Broad. Sys. of Florida, Inc.,* 564 So.2d 186, 189 (Fla.Dist.Ct.App.1990) (accepting similar language as sufficient to show that the employee "consented to the assignment in writing in her original employment contract").

### 3. PAS's Status as Successor to PCI

 Relying on *Ginny's Kids International, Inc. v. Secretary of State,* 29 P.3d 333 (Colo.App.2000), Dowell asserts that PAS was not a "successor" to PCI and, thus, could not qualify as the type of assignee for which a consented-to assignment could have been made. Even aside from the fact that Dowell's argument does not account for the use of the term "assigns" in addition to "successors," we are not persuaded.

In *Ginny's Kids,* a division of this court noted that, ordinarily, a "successor" corporation was defined as "another corporation which through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." *Ginny's Kids Int'l, Inc. v. Sec'y of State, supra,* 29 P.3d at 336. It also noted that this general definition included the assumption by the successor corporation of functions or activities previously conducted by the predecessor corporation. However, the division ultimately rejected this definition of "successor" in conjunction with a bingo-raffle licensing statute, in part at least, because the use of this definition would allow multiple licenses in violation of constitutional and statutory provisions. Thus, the division excluded from the "successor" concept in the statute entities that had assumed only "certain functions, activities, or parts of an organization." *Ginny's Kids Int'l v. Sec'y of State, supra,* 29 P.3d at 336.

Here, we, like the trial court, see no reason why the ordinary understanding of the term "successor" should not be applied. And because, as the trial court noted, "the more usual definition of successor" includes a business that succeeds to the whole or part of the business of another company, the trial court did not abuse its discretion in preliminarily concluding PAS was a successor to PCI.

### 4. Sufficiency of Evidence: Assignment

 Finally, we reject Dowell's contention that the evidence was insufficient to support the trial court's finding that PCI had assigned his employment contract to PAS.

Dowell premises his contention largely on the fact that the Transfer Agreement that purported to transfer his employment contract, along with every other kind of property, from PCI to PAS was left blank.

 No particular formalities are necessary to effect a valid assignment. However, the "intent to make the assignment must be apparent," and that intent "may be reflected by the written instruments executed by the parties or ... inferred from the acts and conduct of the assignor." *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.,* 867 P.2d 70, 73–74 (Colo. App.1993).

 Whether the parties had the requisite intent to effect an assignment is a question of fact for the trial court to resolve. *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs., supra,* 867 P.2d at 74.

Here, the trial court found, based upon the testimony of PCI's chief executive officer, that "there's no doubt" that the intent of the PCI–PAS transaction was to assign, among other things, PCI's employment agreements

to PAS. PCI's chief executive officer testified that PCI intended to transfer Dowell's employment agreement and that the only reason the Transfer Agreement was left blank was because the lawyers and accountant in charge of completing the form failed to do so before closing.

Because there was support in the record for the trial court's preliminary finding that PCI intended to, and indeed did, transfer the employment agreement to PAS, we will not disturb that finding on appeal. *See Tiger v. Anderson, supra,* 976 P.2d at 310–11 (appellate court accepts trial court's findings of fact unless they are so clearly erroneous as to find no support in the record).

### V. Attorney Fees

Based on his successful defense of Phoenix's appeal and his overturning part of the preliminary injunction, Dowell contends that he is entitled, under a "prevailing party" provision of the employment agreement, to an award of attorney fees incurred on appeal. We are empowered to order such an award. *See Zambruk v. Perlmutter 3rd Generation Builders, Inc.,* 32 Colo.App. 276, 281, 510 P.2d 472, 475–76 (1973). Given the ongoing nature of the case, however, we think it best that the trial court determine, at the appropriate time, whether and to what extent Dowell is entitled to "prevailing party" attorney fees, including fees incurred in this appeal. *See* C.A.R. 39.5.

The court's order is vacated to the extent it preliminarily enjoins Dowell from soliciting Phoenix's customers. Otherwise, the order is affirmed, and the case is remanded for further proceedings consistent with the views expressed in this opinion.

Judge CARPARELLI concurs.

Judge TERRY specially concurs.

Judge TERRY specially concurring.

I concur in the result and analysis of the majority opinion. I write separately to bring attention to an issue, not resolved by this decision, that will likely result in future litigation.

We resolve this appeal primarily by focusing on whether Dowell was "staff to executive and management personnel." We do not decide one of the main issues briefed by the parties, namely, what kind of employees qualify as "professional staff." We conclude that "the accepted meaning of the term 'professional' is . . . broader than simply a member of a 'learned profession,'" and that, by dint of education or experience, a person may be considered a "professional."

Here, it was not necessary to decide conclusively whether Dowell was a "professional," because he was not "staff to executive and management personnel." However, not every case can be resolved on this basis. There could arise instances in which an employee would qualify as "staff to executive and management personnel" because he or she primarily serves as a key member of the manager's or executive's staff in the implementation of management or executive functions, but where there would be a legitimate question as to whether the employee was "professional staff."

The lack of statutory definition of the term "professional staff" thus presents a problem that will likely arise in future litigation. Because (1) noncompetition and nonsolicitation agreements are in wide circulation in business, (2) expensive litigation concerning such issues is a significant risk for both employers and employees, and (3) such agreements could impede an employee's ability to work and earn a living in future employment, I commend this issue to the attention of the General Assembly.