SATURN SYSTEMS, INC.,
Plaintiff–Appellee,

v.

Delbert J. MILITARE, a/k/a Del J. Militare, individually and d/b/a Mil–Beau and Mil–Beau, Inc., Defendant–Appellant.

No. 07CA2453.

Colorado Court of Appeals,
Div. II.

Feb. 17, 2011.

§ 24–51–1105, C.R.S.2010.

Garlin Driscoll Howard, LLC, Thomas P. Howard, Kenneth R. Morris, Louisville, CO, for Plaintiff–Appellee.

Godfrey & Lapuyade, P.C., Steven R. Schumacher, Englewood, CO, for Defendant–Appellant.

Opinion by Judge LOEB.

Defendant, Delbert J. Militare, appeals the judgment entered after a bench trial in favor of plaintiff, Saturn Systems, Inc., on its claims of misappropriation of trade secrets and breach of contract. Militare also appeals the trial court's order awarding attorney fees and costs to Saturn. We affirm and remand with directions.

## I. Background and Procedural History

Saturn is a debt collection agency that offers numerous types of debt collection services, including recovery of commercial, consumer, medical, government, and retail accounts, both domestically and abroad. According to testimony at trial, since its founding in 1997, Saturn has provided its services to over 1,600 clients, for whom it has processed and helped collect over 120,000 debts.

Evidence at trial showed that Saturn spent significant time and money to develop a proprietary website to provide its clients access to its database of client and debtor information. Thus, Saturn assigns each client a unique username and password that can be used to log in to the website and view real-time information related to that client's account. For example, a client can view a "status report" for its account, which summarizes Saturn's debt recovery to date and tells the client how many pre-purchased debt collection accounts it has available to designate to debtors in default so that Saturn can initiate collection activities. A client can also view the "debtor notes" for its debtors that have entered Saturn's "hardcore" collection phase. Saturn uses the "debtor notes" component of its website to record pending collection efforts, settlement negotiations, and all known personal information for a debtor, such as addresses, bank accounts, and em-

ployment history. Because of the confidential nature of the information that can be accessed via its website, Saturn only releases the usernames and passwords to the client and, if needed, to the sales agent assigned to that client's account.

On January 13, 2003, Saturn hired Militare for a sales agent position. The parties entered into a written sales agent agreement (Agreement) that outlined their respective roles. In that regard, Militare agreed to act as an independent contractor with the authority to sell Saturn's services, receive funds on Saturn's behalf, and make sales presentations to prospective clients. Additionally, Militare agreed to provide ongoing customer care to the clients that he signed up for Saturn's services. In return, Saturn agreed to pay Militare a commission on each sale that he made. The Agreement also included the following provisions that are pertinent to this appeal:

> (12) Confidentiality: Agent agrees that any client lists, sales materials and proprietary information will be considered confidential and not revealed to outside persons with the exception of clients and prospective clients during the sales or service of Company's services and that he will not solicit Company clients on behalf of his/her self or any other entity. This provision is to last for the duration of this agreement and for 1 year following the termination of this agreement.
>
> . . . .
>
> (14) Attorney Fees: In the event that it is necessary for either party to bring legal action against the other to remedy any breach of this agreement, both parties agree that the prevailing party will be entitled to reasonable, but not less than actual, attorney's fees and other costs to which that party may be entitled and that these cost [sic] will be paid by the losing party.

Although the confidentiality provision of the Agreement does not contain a specific geographic limitation, the parties agreed at trial (and the trial court found) that its geographic scope was limited to Colorado.

As a Saturn sales agent, Militare was provided access to and was taught how to use the confidential database on the Saturn website.

Saturn terminated the Agreement with Militare approximately two years later by proper written notice. The effective date of the termination was January 18, 2005. Shortly thereafter, on January 31, 2005, Militare accepted a position with CB Solutions, LLC, a Texas-based company and a direct competitor of Saturn.

In March 2005, while working for CB Solutions, Militare personally visited Premier Members Federal Credit Union, a longtime Saturn client that still had unused pre-purchased debt collection accounts available with Saturn. Militare admitted at trial that he contacted Premier on behalf of CB Solutions to win the Premier account. Although the parties disputed the details of Militare's visit, the record indicates that Premier contacted Saturn shortly after the visit to request a new password for its Saturn account.

Upon learning of Militare's visit to Premier, in early April 2005, Saturn retained David Travis, a computer and website specialist, to investigate suspected unauthorized access of Saturn's website by Militare. Travis's investigation confirmed Saturn's suspicions. According to Travis, Militare repeatedly accessed fifteen client accounts, including the debtor notes associated with those accounts, subsequent to his termination from Saturn. Travis found that in doing so, Militare reviewed a total of seventy-two privileged and confidential Saturn web pages.

In March and April 2005, Saturn also sent cease and desist letters to Militare demanding that he stop using its confidential data and soliciting Saturn clients, in violation of the Agreement and Colorado's trade secret laws.

On May 6, 2005, Saturn filed its complaint in this action, alleging claims of misappropriation of trade secrets and breach of contract and seeking damages and injunctive relief. The parties submitted cross-motions for summary judgment, which were denied, and the case was then tried to the court on September 11 and 12, 2007.

After the close of evidence, Militare stipulated to the injunctive relief requested by Saturn on its trade secrets claim, and the court entered a stipulated order for injunctive relief on October 1, 2007. That order is not a subject of this appeal.

On October 31, 2007, the court entered a written order of judgment in Saturn's favor, finding Militare liable for misappropriation of Saturn's trade secrets and breach of the nondisclosure and nonsolicitation clauses set forth in the confidentiality provision of the Agreement. The court awarded Saturn $525 in damages for the cost of Travis's investigation as well as attorney fees and costs under the fee-shifting provision of the Agreement. After briefing by the parties on the amount of attorney fees and costs, the court entered an order on January 3, 2008, awarding Saturn $70,619.03 in attorney fees and $2,482.04 in costs. Militare timely appealed from the court's October 31, 2007 judgment and the January 3, 2008 attorney fees order.

## II. Standard of Review

In an appeal from a judgment entered after a trial to the court, our review of the court's judgment is a mixed question of fact and law. Because the credibility of the witnesses and the sufficiency, probative effect, and weight of all the evidence, plus the inferences and conclusions to be drawn therefrom, are all within the province of the trial court, we will not disturb the court's findings of fact unless they are so clearly erroneous as to find no support in the record. *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1383 (Colo. 1994); *Page v. Clark*, 197 Colo. 306, 313, 592 P.2d 792, 796 (1979); *Skyland Metro. Dist. v. Mountain W. Enter., LLC*, 184 P.3d 106, 115 (Colo.App.2007); *Cottonwood Hill, Inc. v. Ansay*, 709 P.2d 62, 64 (Colo.App.1985). It is not our role as a reviewing court to decide the facts, and we will not substitute our judgment for that of the trier of fact. *Page*, 197 Colo. at 313, 592 P.2d at 796; *Martinez v. Reg'l Transp. Dist.*, 832 P.2d 1060, 1061 (Colo.App.1992). While we review a trial court's factual findings under the clear error standard, we review its legal conclusions and application of the governing statutory standards de novo. *Joseph v. Equity Edge, LLC,*

192 P.3d 573, 577 (Colo.App.2008); *DiCocco v. Nat'l Gen. Ins. Co.*, 140 P.3d 314, 316 (Colo.App.2006).

## III. Misappropriation of Trade Secrets

Militare contends the trial court erred by finding that he misappropriated Saturn's trade secrets because there was insufficient evidence to show that (1) Saturn possessed valid trade secrets, and (2) Militare misappropriated Saturn's trade secrets. We reject these contentions in turn.

### A. Trade Secrets Finding

First, Militare contends there is insufficient evidence to support the trial court's finding that the client and debtor information contained within Saturn's proprietary website database qualifies as trade secrets under Colorado law. We disagree.

What constitutes a trade secret is a question of fact for the trial court. *Network Telecomms., Inc. v. Boor-Crepeau*, 790 P.2d 901, 902 (Colo.App.1990). Accordingly, if the court's trade secret determination is supported by the record, we will not disturb it on appeal. *See Page*, 197 Colo. at 313, 592 P.2d at 796.

The Colorado Uniform Trade Secrets Act (UTSA), sections 7–74–101 to –110, C.R.S. 2010, defines a trade secret as:

[T]he whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value.

§ 7–74–102(4), C.R.S.2010.

Colorado courts may consider several factors to make the factual determination of whether a trade secret exists under this statutory definition, including: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, such as the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the

information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Network Telecomms., Inc.*, 790 P.2d at 903 (citing *Porter Indus., Inc. v. Higgins*, 680 P.2d 1339 (Colo.App.1984)).

The UTSA further provides:

To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

§ 7-74-102(4). Thus, prior divisions of this court have held that "the alleged secret must be the subject of efforts that are reasonable under the circumstances to maintain its secrecy," but that "[e]xtreme and unduly expensive procedures need not be taken." *Colo. Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo.App.1990) (citing *Network Telecomms., Inc.*, 790 P.2d at 902). Reasonable efforts have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on a "need to know" basis, and controlling plant access. *Id.*

Here, the trial court found that Saturn's client and debtor information stored within its proprietary database qualified as trade secrets under Colorado law because: (1) the information is confidential and not known outside of the business, either by competitors or the general public; (2) the real-time information is available only through the use of a client's username and password; (3) access to Saturn's database is strictly limited on a "need to know" basis; and (4) Saturn has taken reasonable efforts to maintain the secrecy of the information stored within its database.

The record supports the trial court's findings. Saturn's president testified that the specific information contained within its "status reports" and "debtor notes" is highly valuable to it and to competitors. For example, the testimony established that a competitor could use its knowledge of a client's available pre-purchased accounts and of the amount of debt recovered to date to develop a competitive marketing strategy exactly when that client was ripe for renewal with Saturn. Likewise, the testimony established that a competitor could use the highly detailed information contained within Saturn's debtor notes to usurp sales opportunities.

Further, Saturn's president described the security precautions that Saturn has taken to protect its proprietary information, including a password-protected and encrypted website and a policy of limited access. There was also testimony about the significant amount of money spent by Saturn to develop and maintain its database of information.

Accordingly, because there is substantial evidence in the record to support the trial court's finding that Saturn possessed valid trade secrets, we will not disturb that finding on appeal. *See Page*, 197 Colo. at 313, 592 P.2d at 796.

We are not persuaded by Militare's contention that because Saturn did not present evidence of the exact data and figures allegedly misappropriated by Militare from its database, Saturn did not carry its burden to prove the existence of valid trade secrets. Given the dynamic nature of the information stored within Saturn's database, it was not necessary for Saturn to produce the exact client and debtor information accessed by Militare. Nor, in our view, would it be practical to impose such a burden on the owner of trade secrets, where, as here, the confidential information is constantly being updated in real time. Saturn produced evidence of the specific types of confidential information stored in its database, with sufficient particularity to identify the existence of its claimed trade secrets. *Cf. Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir.1998) (plaintiff should describe the subject matter of the trade secret with sufficient particularity, and a general catchall phrase does not achieve the requisite level of specificity when plaintiff claims a numerical dimension as a trade secret). As discussed above, the trial court properly relied on Saturn's evidence to determine that Saturn possessed valid trade secrets as defined by the UTSA and well-established Colorado case law.

## B. Misappropriation Finding

■ Militare also contends there is insufficient evidence to support the trial court's finding that Militare misappropriated Saturn's trade secrets. He bases this contention in part on a related discovery contention, which we address first.

### 1. Expert Testimony

Militare contends the court erred by admitting the expert testimony of Travis at trial because Saturn failed to comply with the pretrial disclosure requirements of C.R.C.P. 26(a)(2). We perceive no reversible error by the trial court.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *D.R. Horton, Inc.—Denver v. Bischof & Coffman Constr., LLC,* 217 P.3d 1262, 1267 (Colo.App.2009). A court does not abuse its discretion unless its decision is manifestly arbitrary, unreasonable, or unfair. *Id.*

C.R.C.P. 26(a)(2)(B)(II) governs pretrial disclosure of expert testimony of experts, like Travis, who are not "retained or specially employed to provide expert testimony, or whose duties as an employee of the party regularly involve giving expert testimony." *Ajay Sports, Inc. v. Casazza,* 1 P.3d 267, 274 (Colo.App.2000); *see also* C.R.C.P. 26(a)(2)(B)(I). Under this rule, a party presenting such an expert must disclose a written report or summary that "contain[s] the qualifications of the witness and a complete statement describing the substance of all opinions to be expressed and the basis and reasons therefor." C.R.C.P. 26(a)(2)(B)(II). This disclosure must be made at least 120 days before trial by a claiming party under a complaint. C.R.C.P. 26(a)(2)(C)(I).

■ There are sanctions available to the court under C.R.C.P. 37(c)(1) for violations of the pretrial disclosure requirements of C.R.C.P. 26(a). C.R.C.P. 37(c)(1) provides in pertinent part:

A party that without substantial justification fails to disclose information required by C.R.C.P. .... 26(a) ... shall not, unless such failure is harmless, be permitted to present any evidence not so disclosed at trial....

*See also Ajay Sports, Inc.,* 1 P.3d at 274. Thus, the rule requires the preclusion of undisclosed expert evidence only where (1) there is no substantial justification for a party's failure to disclose, and (2) the failure to disclose is not harmless to the opposing party. *See Trattler v. Citron,* 182 P.3d 674, 679–80 (Colo.2008).

In evaluating whether a failure to disclose evidence is harmless under Rule 37(c), the inquiry is not whether the new evidence is potentially harmful to the opposing side's case. Instead, the question is whether the failure to disclose the evidence in a timely fashion will prejudice the opposing party by denying that party an adequate opportunity to defend against the evidence.

*Todd v. Bear Valley Vill. Apartments,* 980 P.2d 973, 979 (Colo.1999).

In this case, Saturn listed Travis's company in its initial C.R.C.P. 26 disclosures, stating that "[r]epresentatives from this company have information as to the investigations that they performed to gather evidence of unauthorized access to Saturn's website and trade secret information by the defendant." Saturn also timely designated Travis as an expert witness pursuant to CRE 702, 703, and 705, and provided the following information about Travis and the opinions that he would present at trial:

Mr. Travis is an expert in computers and websites. He will provide opinions relating to the following matters. Restricted areas of Saturn's website were accessed by a computer used by the defendant. He will identify the line numbers, dates, times, pages, client names, client IDs, debtor numbers, content and other information relating to the information improperly accessed from the defendant's computer.

The basis and reasons for such opinions are predicated up [sic] Mr. Travis' knowledge of computers and websites, his direct investigation of computer information relating to Saturn's website, examination of e-mails received by Saturn from defendant's computer, and other data.

. . . .

Mr. Travis' qualifications are based on his longstanding experience and training in computers and websites, as well as his direct involvement in the creation and maintenance of Saturn's website.

This designation was accompanied by a spreadsheet listing all instances of improper access of Saturn's website by Militare. Thus, more than a year and a half prior to trial, Saturn disclosed not only its intention to call Travis as an expert at trial, but the substance of Travis's expert opinions, the basis and reasons for the opinions, and the exact dates, times, and web locations of Militare's unauthorized website access that Travis uncovered.

In the weeks prior to trial, in connection with Saturn's motion for telephone testimony of Travis at trial, Saturn disclosed Travis's curriculum vitae and the remainder of Travis's file, which was a more detailed record of the numerous instances of Militare's unauthorized website access. However, Militare did not receive a formal written report summarizing Travis's expert testimony until the day before trial, after the court granted Militare's request for such a report in connection with the court's order permitting Travis to testify by telephone.

At trial, Militare contemporaneously objected to Travis's testimony on the ground of "nondisclosure of his opinions," specifying the late disclosure of Travis's expert report.

On appeal, Militare contends the trial court abused its discretion by allowing Travis to testify because Saturn did not produce the written summary or report required by C.R.C.P. 26(a)(2)(B)(II) until the day before trial. Initially, we question whether the court erred at all by allowing Travis to testify, given Saturn's early disclosure of Travis's expert opinions as contained in the expert witness designation, the early disclosure of the data that Travis collected of unauthorized website access, and Saturn's consistent provision of information to Militare in the weeks prior to trial.

Nonetheless, even if Saturn technically violated C.R.C.P. 26(a)(2)(B)(II) by failing to timely produce a written report, we perceive no prejudice resulting from this late disclosure that would require preclusion of Travis's expert report or the entirety of his expert opinions. *See* C.R.C.P. 37(c)(1); *Trattler*, 182 P.3d at 679–80; *Todd*, 980 P.2d at 979–80.

Although the report was presented to Militare the day before trial, the record shows Militare was aware of the information summarized within the report long before trial. The raw data of Travis's investigation— namely, the individual findings of Militare's unauthorized access of the password-protected areas of Saturn's website—had already been catalogued and presented to Militare in the form of a spreadsheet. *See Kussman v. City & County of Denver*, 671 P.2d 1000, 1001 (Colo.App.1983) (no reversible error where party did not receive summary of physician's opinion until seven days prior to trial, but received medical records and raw medical data prior to trial), *rev'd on other grounds*, 706 P.2d 776 (Colo.1985). Further, while the spreadsheet was initially redacted to exclude client names, client IDs, and debtor numbers, Militare received the complete spreadsheet prior to trial. *Cf. Camp Bird Colo., Inc. v. Bd. of County Comm'rs*, 215 P.3d 1277, 1290 (Colo.App.2009) (expert report admitted but information not previously known to the opposing party redacted). Militare also received all of the information possessed by Saturn's counsel that related to Travis. *See McCrea & Co. Auctioneers, Inc. v. Dwyer Auto Body*, 799 P.2d 394, 398 (Colo. App.1989) (no abuse of discretion under local discovery rules to allow expert testimony where opposing party is notified of expert more than one year before trial and is furnished with all information in counsel's possession). Moreover, early in the discovery phase of the case, Militare was provided with Travis's contact information, fields of expertise, and the basis for his expert opinions, but never deposed him.

There is no indication in the record, and Militare provides none, that Militare was surprised by the actual report or denied an adequate opportunity to defend against it. *See Ajay Sports, Inc.*, 1 P.3d at 275 (any error in permitting undisclosed expert testimony was harmless where party claiming surprise by the testimony does not specify how he was prejudiced or what additional

information he could have elicited on cross-examination). Further, upon receiving the report, Militare never asked for a continuance in order to obtain additional information related to Travis's investigation. *See id.; Kussman*, 671 P.2d at 1001.

Under these circumstances, we conclude that any failure to produce Travis's report itself was harmless because Militare had an adequate opportunity to defend against the evidence contained therein. *Todd*, 980 P.2d at 979. Accordingly, we conclude that the trial court did not abuse its discretion by admitting Travis's entire testimony at trial.

### 2. Misappropriation

■ Because we conclude that Travis's expert testimony was properly admitted, we reject Militare's contention that the record does not support the trial court's finding that he misappropriated Saturn's trade secrets.

■ Under the UTSA, "misappropriation" is defined in pertinent part as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." § 7–74–102(2)(a), C.R.S.2010. " 'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* at § 7–74–102(1), C.R.S.2010. As a prior division of this court observed, "[t]here is no requirement in Colorado's [UTSA] that there be actual use or commercial implementation of the misappropriated trade secret for damages to accrue. Misappropriation consists only of the improper disclosure or acquisition of the trade secret." *Sonoco Prods. Co. v. Johnson*, 23 P.3d 1287, 1290 (Colo.App.2001).

Here, the trial court found that Militare "knowingly misappropriated numerous trade secrets belonging to Saturn" at the time of his termination and that "subsequent to that termination, [he] repeatedly accessed the Saturn website to review and update privileged information, without permission ... caus[ing] injury to [Saturn]." The court further concluded that Militare "knowingly used

improper means in order to use Saturn's trade secrets for his benefit."

The court's findings and conclusions are adequately supported by the record. Travis's expert report and testimony described specific instances of Militare's unauthorized access of Saturn's client accounts subsequent to his termination, and Militare himself confirmed at trial that he accessed confidential information on the Saturn website after the Agreement was terminated. At trial, Militare testified that he "viewed" the restricted areas of Saturn's website subsequent to his termination, but that he did not "utilize" or "print" any information. For the purposes of a misappropriation inquiry under the UTSA, it is irrelevant whether Militare actually used Saturn's client and debtor information to compete against Saturn, or actually disclosed the information to others. *See* § 7–74–102(2); *Sonoco Prods. Co.*, 23 P.3d at 1290. Thus, because there is ample evidence in the record that Militare knowingly acquired password-protected information by improper means, we will not disturb the court's misappropriation finding on appeal.

### IV. Breach of Sales Agent Agreement

Militare contends the trial court erred by finding that he breached the nonsolicitation and nondisclosure clauses of the confidentiality provision of the Agreement with Saturn. Because we conclude that the record supports the court's finding of breach of the nonsolicitation clause, we need not address Militare's contention that the evidence is insufficient to support the court's finding of breach of the nondisclosure clause.

### A. Nonsolicitation Clause

Militare contends the nonsolicitation clause of the Agreement is void under Colorado law, and as such, he cannot be liable for breach of an invalid and unenforceable provision. We disagree.

■ The interpretation of language in a contract is a question of law that an appellate court reviews de novo. *Roberts v. Adams*, 47 P.3d 690, 694 (Colo.App.2001). Whether a contractual provision is enforceable is also a question of law that we review

de novo. *Planned Pethood Plus, Inc. v. Key-Corp, Inc.*, 228 P.3d 262, 264 (Colo.App.2010).

■■■ In construing a contractual provision to determine its enforceability, our primary obligation is to effectuate the intent of the contracting parties according to the plain language and meaning of the contract. *Albright v. McDermond*, 14 P.3d 318, 322 (Colo. 2000). A written contract that is complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to its plain language. *Id.*

■ An agreement not to solicit customers, as here, is a form of an agreement not to compete. *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 844 (Colo.App.2007). Agreements not to compete, with some narrow exceptions, are contrary to the public policy of Colorado and are void. *Id.* at 840.

> The core policy underlying the unenforceability of noncompetition provisions is a prohibition on the restraint of trade or . . . the right to make a living. In order to make a living, the former employee needs to be free to solicit (actively or passively) former customers, as long as he or she does not use the employer's trade secrets to do so.

*Id.* at 844.

■ Colorado's statutory approach to agreements not to compete is codified at section 8–2–113(2), C.R.S.2010, which provides:

> Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:
>
> (a) Any contract for the purchase and sale of a business or the assets of a business;
>
> (b) Any contract for the protection of trade secrets;
>
> (c) Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;

> (d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

Thus, any agreement that restricts a person's right to receive compensation for work performed is void ab initio unless it fits one of the four statutory exceptions. *See Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 765 (Colo.App.1988).

■ The issue before us in this appeal is whether the nonsolicitation clause in the confidentiality provision of the Agreement is valid and enforceable under section 8–2–113(2)(b), as part of a contract for the protection of trade secrets. We conclude that it is valid and enforceable.

■ A prior division of this court has adopted a two-prong test to determine whether a noncompetition clause fits within the trade secrets exception of section 8–2–113(2)(b). *See id.* at 766. "The trial court must first examine the factual situation to determine whether a restrictive covenant is justified at all. . . . The trial court must then examine the specific terms of the noncompetition clause to determine the reasonableness of their effect." *Id.* A noncompetition clause designed to protect trade secrets must be narrowly drafted. *Id.* at 765. Nevertheless, an agreement not to solicit an employer's customers is enforceable so long as its purpose is to protect the employer's trade secrets and it is reasonably limited in time and geographic scope. *See Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910–11 (Colo. App.1997); *Mgmt. Recruiters*, 762 P.2d at 766.

The Agreement between Saturn and Militare included the following confidentiality provision:

> Agent agrees that any client lists, sales materials and proprietary information will be considered confidential and not revealed to outside persons with the exception of clients and prospective clients during the sales or service of Company's services and that he will not solicit Company clients on behalf of his/her self or any other entity. This provision is to last for the duration of

this agreement and for 1 year following the termination of this agreement.

As noted above, at trial, the parties stipulated that the geographic scope of this provision was limited to Colorado, and the reasonableness of neither the geographic nor temporal scope of the confidentiality provision is disputed in this appeal.

Here, we conclude that the nonsolicitation clause in paragraph 12 of the Agreement fits within the trade secrets exception to section 8–2–113(2). As discussed above, the trial court properly found with record support that Saturn's confidential client and debtor information (including "client lists, customer contracts, pricing information, detailed debtor information, client information and customer log-in codes") qualified as trade secrets under the UTSA. Thus, under the plain language of the Agreement, the nonsolicitation clause was necessary to safeguard Saturn's debt collection business. More particularly, the clause was necessary to prevent former employees or independent contractors from using their knowledge of Saturn's confidential information—such as a client's number of unused pre-purchased collection accounts, a debtor's personal information, and the percentage of debt recovered per client—to solicit Saturn clients, especially those clients who were ripe for renewal. We find it instructive that Saturn included the nonsolicitation clause within a single confidentiality provision in the Agreement, designed to protect its "client lists, sales materials, and proprietary information," thereby expressing an intent to prohibit former employees or independent contractors from using trade secrets to solicit former clients. See Gold Messenger, Inc., 937 P.2d at 911 (a general noncompetition clause that restricts a franchisee from competing with a franchisor is valid under the trade secrets exception because it is read in conjunction with the agreement's preamble to find a clear intent to prohibit a franchisee from using confidential information to compete unfairly against franchisor).

We, therefore, conclude that the nonsolicitation clause restricting Militare's ability to solicit Saturn's clients for one year was necessary to protect Saturn's confidential client and debtor information that can only be accessed through a password-protected website. See Mgmt. Recruiters, 762 P.2d at 766 (noncompetition agreement that restricts an employee of a recruiting agency from contacting any job candidates with whom he had actual contact during his final year at the agency held valid because it was tailored to prevent the misappropriation of trade secrets by the employee). This case is thus distinguishable from cases where a trial court has found that a trade secret does not exist, and, accordingly, a noncompetition agreement could not be necessary for the protection of trade secrets. See, e.g., Porter Indus., Inc., 680 P.2d at 1342.

Further, Militare's reliance on Colorado Accounting Machines, Inc. v. Mergenthaler, 44 Colo.App. 155, 156, 609 P.2d 1125 (1980), is misplaced because the challenged provision in that case is distinguishable from the contractual provision at issue here. In Mergenthaler, a division of this court ruled that where the parties' agreement contained a nondisclosure of trade secrets clause to protect valid trade secrets, a separate and general restrictive covenant prohibiting all forms of competition would not be read to serve that protective purpose as well. Mergenthaler, 44 Colo.App. at 156, 609 P.2d at 1126 ("Even if we assume, arguendo, that a narrowly drafted non-competition clause specifically protecting trade secrets would be a valid exception under subsection (b), here, the sole purpose behind the restrictive covenant is to prohibit all competition.... Consequently, the trade secret provision is valid; the restrictive covenant is not."); see also Dresser Indus., Inc. v. Sandvick, 732 F.2d 783, 788 (10th Cir.1984) (citing Mergenthaler for the proposition that a naked covenant not to compete, which is void under the statute, cannot be validated by the insertion of a companion clause dealing with trade secrets).

Here, by contrast, and contrary to Militare's argument, the nonsolicitation clause is not separate from the nondisclosure clause. Rather, both clauses (which are in the same sentence) are part of an explicit confidentiality provision in the Agreement, which, by its plain and unambiguous language, is designed to protect the confidentiality of Saturn's "client lists, sales materials and proprietary

information." Further, the nonsolicitation provision here is not a naked covenant restricting all competition by Militare, but rather, is a narrowly tailored provision restricting him only from soliciting Saturn's clients as a way of protecting Saturn's trade secrets and confidential information.

Because we read the plain language of the nonsolicitation clause here as serving the valid purpose of protecting Saturn's trade secrets and as having a reasonable effect upon former employees or independent contractors given the nature of Saturn's debt collection business, we view the clause as a permissible and enforceable restriction under *Gold Messenger* and *Management Recruiters,* as opposed to the form of impermissible bar on all competition found invalid under *Mergenthaler.* Therefore, applying the two-prong test articulated by the division in *Management Recruiters,* we conclude that the nonsolicitation clause here fits the trade secrets exception in section 8–2–113(2)(b). As such, we conclude that is not void under Colorado law.

### B. Breach of Nonsolicitation Clause

■ Because we conclude that the Agreement contained a valid nonsolicitation clause, we address and reject Militare's contention that the trial court erred by finding that he breached the nonsolicitation clause.

In reviewing a breach of contract case, we defer to the trial court's findings of fact if the record supports them. *Albright,* 14 P.3d at 322.

Here, the trial court found as follows:

Militare was the Saturn sales agent serving Premier ... prior to his termination. In that position, Militare knew (1) that Premier was a Saturn client for the use of Saturn's collection services; (2) that it had entered into [a] contract with Saturn for the use of its collection services; and (3) that it had pre-purchased debtor collection accounts from Saturn. Based on his knowledge of this proprietary business information regarding Saturn, Militare knew that Premier was worth soliciting as a potential purchaser of debt collection services.

Subsequent to his termination from Saturn, Militare knowingly and intentionally attempted to solicit Premier, a client of Saturn. This constituted a breach of Clause 12 of the Agreement. Militare relied on trade secrets of Saturn in order to facilitate his solicitation of Premier. Travis testified that on December 7, 2004, shortly before leaving Saturn, Militare reviewed two separate Premier status reports on the Saturn System. Those reports told Militare confidential information about the account and when it would be vulnerable for solicitation. Indeed, three months later Militare appeared at Premier and solicited [its] business.

. . . .

The Court finds Clause 12 of the Agreement to be reasonable. Therefore, this Court finds Militare's solicitation of Premier constituted a breach of the non-solicitation clause of the Agreement.

The evidence adduced at trial supports the court's finding that Militare breached the nonsolicitation clause of the Agreement. Indeed, Militare admitted at trial that, while working for CB Solutions, he personally visited Premier to solicit Premier's business:

Q: Mr. Militare, you contacted Premier Members Federal Credit Union in March of 2005, correct?

A: I believe that was the later part of March. Yes, that's correct.

. . . .

Q: And you did so in an effort to solicit that company's business, correct?

A: I contacted them to see what their state of mind was as far as looking at the flat fee program. . . .

Q: When you went and spoke to [Premier's employee] you were not working for Saturn Systems, you were working for CB Solutions, correct?

A: I was under contract with CB Solutions, that's correct.

Q: And ... you went back and spoke to [the employee] at that time in an effort to solicit her business for CB Solutions, correct?

A: I was making an inquiry, yes. And if they were interested I would have pursued it.

. . . .

Q: . . . You specifically asked if you could get their business for CB Solutions for their collection services, correct?

A: I stated that it was available if they were interested, yes.

Q: And that was the purpose of your visiting Premier Financial [sic], correct?

A: It was primary [sic] to see what their position was and see what they were interested [sic]. It was an exploratory visitation.

Because there is ample record support for the trial court's finding of breach of the nonsolicitation clause, we will not disturb it on appeal. Further, because we affirm the court's finding as to the nonsolicitation clause, we need not address Militare's related contention that the evidence is insufficient to support the court's finding of breach of the nondisclosure clause, including Militare's contention that the court improperly admitted the testimony of a representative of Premier.

## V. Damages

Militare contends the trial court erred by finding that he is liable to Saturn for breach of contract damages in the amount of $525 because this amount represents the cost of Travis's investigation, which is not recoverable under Colorado law. We disagree.

It has long been the law in Colorado that a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff.

*W. Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo.1992) (citations omitted).

The measure of damages in a breach of contract action is the amount it takes to place the plaintiff in the position it would have occupied had the breach not occurred. *Technics, LLC v. Acoustic Mktg.*

*Research Inc.,* 179 P.3d 123, 126 (Colo.App. 2007), *aff'd,* 198 P.3d 96 (Colo.2008). Damages must be also be "traceable to and the direct result of the wrong sought to be redressed." *City of Westminster v. Centric–Jones Constructors,* 100 P.3d 472, 478 (Colo. App.2003) (quoting *Husband v. Colo. Mountain Cellars, Inc.,* 867 P.2d 57, 59–60 (Colo. App.1993)).

Militare first raised the issue of Saturn's claim for actual damages in his motion for a directed verdict at the close of Saturn's case-in-chief, which the trial court denied. To survive a directed verdict motion challenging proof of actual damages, the plaintiff in a breach of contract action must have presented evidence of both the existence and the cause of damages. *Id.* at 477. The plaintiff must also provide the fact finder with a reasonable basis for calculating actual damages in accordance with the relevant measure. *Id.*

In our view, Saturn's claim for $525, representing the cost of Travis's computer investigation prior to the commencement of litigation, was recoverable as actual damages as a matter of law. Saturn presented testimony that the $525 it spent to retain Travis was traceable to and the direct result of Militare's breach of the nonsolicitation clause of the Agreement. Further, Saturn introduced as an exhibit Travis's invoice for his investigation, thereby proving the existence and the exact amount of its actual damages. Under these circumstances, we conclude that the trial court did not err by finding that Militare is liable to Saturn for damages in the amount of $525.

## VI. Attorney Fees

Militare contends that, in the event that we reverse the trial court's finding that he breached the Agreement, the trial court's award of attorney fees and costs to Saturn must be vacated.

However, because we have concluded that the record supports the court's finding of breach of the nonsolicitation clause, we further conclude that the court did not err in awarding attorney fees and costs to Saturn pursuant to the Agreement.

### VII.  Appellate Attorney Fees

Finally, we turn to Saturn's request for reasonable attorney fees and costs incurred in connection with this appeal.

Under C.A.R. 39.5, "[i]f attorney fees are otherwise recoverable for the particular appeal, the party claiming attorney fees shall specifically request them, and state the legal basis therefor, in the party's principal brief in the appellate court."

In its answer brief, Saturn specifically requests appellate attorney fees and costs pursuant to the attorney fee provision of the parties' Agreement.  Given our conclusion that Militare breached the nonsolicitation clause of the Agreement, we conclude that reasonable appellate attorney fees and costs are recoverable by Saturn as a matter of law.

Pursuant to C.A.R. 39.5, we grant Saturn's request for attorney fees and costs incurred on appeal and, exercising our discretion, remand to the trial court to determine the amount of the award.

The judgment and order for costs and attorney fees are affirmed, and the case is remanded for further proceedings consistent with this opinion.

Judge CASEBOLT and Judge FOX concur.