24CA0301 Peo in Interest of ACG 11-21-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0301
Logan County District Court No. 22JV4
Honorable Justin B. Haenlein, Judge

The People of the State of Colorado,

Appellee,

In the Interest of A.C.G., a Child,

and Concerning M.J.G. and J.A.N.,

Appellants.

JUDGEMENT AFFIRMED

Division V
Opinion by JUDGE FREYRE
Grove and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 21, 2024

Alan Samber, County Attorney, Kimberlee R. Keleher, Assistant County
Attorney, Sterling, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Just Law Group LLC, John F. Poor, Denver, Colorado, for Appellant M.J.G.

Beth Padilla, Office of Respondent Parents' Counsel, Durango, Colorado for
Appellant J.A.N.

¶ 1    In this dependency and neglect proceeding, M.J.G. (father) and J.A.N. (mother) appeal the judgment terminating their parent-child legal relationships with A.C.G. (the child). We affirm.

## I.    Background

¶ 2    In January 2022, the then-newborn child tested positive for methamphetamine, amphetamine, and THC. The juvenile court granted emergency temporary custody to the Logan County Department of Human Services. When the child was discharged from the hospital, the Department placed him with his paternal grandfather. Shortly thereafter, the Department filed a petition in dependency and neglect alleging concerns about the parents' substance use and the unsafe conditions of their home.

¶ 3    The juvenile court adjudicated the child dependent or neglected. The court adopted treatment plans that required the parents to address substance abuse issues, develop a safe and stable environment for the child, improve their relationships with the child, cooperate with the Department, address mental health issues, and comply with the recommendations of a psychological evaluation.

1

¶ 4     The Department later moved to terminate the parents' legal relationships with the child.  Beginning in June 2023, the juvenile court held a ten-day hearing over the course of approximately five months.  In January 2024, the juvenile court granted the termination motion.

## II.     Expert Witness Disclosures

¶ 5     Father contends that the juvenile court abused its discretion and violated his due process rights by allowing the Department's expert witnesses to offer testimony that was not properly disclosed before the termination hearing.  We are not persuaded.

### a. Applicable Law and Standard of Review

¶ 6     The provisions of C.R.C.P. 26, including its expert witness disclosure requirements, apply to juvenile proceedings when, as here, the juvenile court orders that they govern the case.  *See People in Interest of S.L.*, 2017 COA 160, ¶ 67.  C.R.C.P. 26(a)(2) limits all expert witness testimony to matters disclosed in detail in the expert's report or disclosure statement.  C.R.C.P. 26(a)(2)(B)(I)-(II).

¶ 7     When a party fails to disclose, without substantial justification, information required by C.R.C.P. 26(a), the party "shall

not be permitted to present any evidence not so disclosed at trial . . . unless such failure has not caused and will not cause significant harm, or such preclusion is disproportionate to that harm." C.R.C.P. 37(c)(1). "Thus, the rule requires the preclusion of undisclosed expert evidence only where (1) there is no substantial justification for a party's failure to disclose, and (2) the failure to disclose is not harmless to the opposing party." *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 523 (Colo. App. 2011).

¶ 8 We review a juvenile court's decision to admit expert testimony for an abuse of discretion. *S.L.*, ¶ 68. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 9 An error in the admission of evidence is harmless if it doesn't affect a party's substantial rights. *See* CRE 103(a); C.R.C.P. 61. An error affects a substantial right if it can be said with fair assurance that it substantially influenced the outcome of the case or impaired the basic fairness of the trial. *People in Interest of R.J.*, 2019 COA 109, ¶ 22.

### b. Analysis

¶ 10 The day before the termination hearing started, father moved to exclude the Department's expert witnesses — the therapeutic

3

family time supervisor and the caseworkers — because the Department had not disclosed the information required for "retained experts," specifically written reports, under C.R.C.P. 26(a)(2)(B)(I). After considering the parties' arguments, the juvenile court found that the therapeutic family time supervisor was not a "retained expert" because she was hired to provide therapeutic visitation, not to provide expert testimony. The court also found that the Department's caseworkers were not "retained experts" because their primary duties were to investigate cases and provide services, and they did not testify "regularly enough" to be considered "retained experts" under the rule. The court then found that the Department's disclosures were sufficient under C.R.C.P. 26(a)(2)(B)(II) because they provided a summary of the experts' opinions and a basis for those opinions. Nonetheless, the court ordered that all the Department's expert witness testimony be limited to the opinions provided in the Department's disclosures.

¶ 11 Even assuming, without deciding, that the Department's expert witness disclosures were insufficient under C.R.C.P. 26(a)(2)(B), any error is harmless. This is so because the record does not indicate, and father does not explain, how he was

4

surprised by the actual testimony or denied an adequate opportunity to defend against it.

¶ 12     When father initially moved to exclude the expert testimony, he broadly argued that the Department's failure to adequately disclose the information required under C.R.C.P. 26(a)(2)(B) put him "at a disadvantage" and that his due process rights were being violated because he was unable to prepare for the expert. He also argued that the Department would use the expert witnesses as a way to introduce "backdoor hearsay." On appeal, he makes similarly broad arguments — that he was "at a substantial disadvantage" during the termination hearing because he was "forced to respond to the testimony of multiple expert witnesses without proper notice of the likely contents of their testimony" and that he was subjected to a "trial by ambush" because he was unable to fully prepare for cross-examination or respond to the experts' opinions.

¶ 13     However, father does not point us to any specific testimony or opinions that surprised him during the hearing. Nor does he point to any alleged "backdoor hearsay" that was admitted through the Department's experts. And he does not articulate what additional

information he could have elicited on cross-examination if the Department's disclosures had been more thorough. To the contrary, the record shows that father had the opportunity to conduct extensive cross-examination of the Department's expert witnesses, make numerous objections to their testimony, and present his own expert witness.

¶ 14 Based on the foregoing, we conclude that any insufficiencies in the Department's disclosures, and any errors in admitting the expert testimony, were harmless because father had an adequate opportunity to defend against the evidence. *See Saturn Sys.*, 252 P.3d at 524–25 (any error in permitting undisclosed expert testimony was harmless where the party claiming surprise by the testimony does not specify how he was prejudiced or what additional information he could have elicited on cross-examination). And, although father argues that the juvenile court's discretion over evidentiary issues does not supersede his due process right to fundamentally fair proceedings, a parent may not obtain relief on a due process claim absent a showing of harm or prejudice. *See People in Interest of J.A.S.*, 160 P.3d 257, 262 (Colo. App. 2007). As explained above, father has not established, and we do not discern,

any prejudice based on the court's admission of the Department's expert witness testimony.

¶ 15    Finally, we decline father's invitation to determine whether a department's caseworkers are considered "retained experts" subject to the disclosure requirements of C.R.C.P. 26(a)(2)(B)(I). *See* C.R.C.P. 26(a)(2)(B)(I)-(II) (explaining what "retained experts" versus "other experts" must disclose). Having concluded that father has not demonstrated any harm or prejudice, we need not make such a determination in this case.

## III.    Reasonable Efforts

¶ 16    Father contends that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate him and reunite his family. We are not persuaded.

### a. Applicable Law and Standard of Review

¶ 17    The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct

or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 18    To determine whether a parent is unfit, the juvenile court must consider whether the department of human services made reasonable efforts to rehabilitate the parent and reunite the family. *See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2024; *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). "Reasonable efforts" means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114), C.R.S. 2024. Services provided in accordance with section 19-3-208, C.R.S. 2024, satisfy the reasonable efforts standard. § 19-1-103(114).

¶ 19    Under section 19-3-208, a department must provide screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time services; and placement services. § 19-3-208(2)(b). And, if funding is available, section 19-3-208 requires a department to provide services such as transportation; diagnostic and mental health services; and drug and alcohol services. § 19-3-208(2)(d). However, services must be provided only

if they are determined to be necessary and appropriate based on the individual case plan.  § 19-3-208(2)(b), (d).

¶ 20    A parent is ultimately responsible for using the services to obtain the assistance needed to comply with their treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).

¶ 21    Whether the Department satisfied its obligation to make reasonable efforts is a mixed question of fact and law.  *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.  Therefore, we review the juvenile court's factual findings for clear error but review de novo its legal determination that the Department made reasonable efforts to rehabilitate the parent.  *Id.*

¶ 22    The credibility of the witnesses, as well as the sufficiency, probative effect, and weight of the evidence, and the inferences and conclusions to be drawn from the evidence, are within the province of the juvenile court.  *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).  We do not reweigh the evidence or substitute our judgment for that of the court.  *People in Interest of K.L.W.*, 2021 COA 56, ¶ 62.

## b. Analysis

¶ 23 The juvenile court found, with record support, that the Department provided father with numerous services, which included outpatient substance abuse and mental health treatment, substance abuse monitoring, in-home services through Safecare, supervised and therapeutic family time, parenting intervention and coaching, a psychological evaluation, a parent-child interactional assessment, and assistance with access to a cell phone and transportation. Thus, the court determined that the Department made reasonable efforts to rehabilitate father and also found that father's choice not to utilize the majority of the services ultimately led to his treatment plan being unsuccessful. We agree with the court's determination that the Department made reasonable efforts.

¶ 24 First, we reject father's argument that the Department's referral to Centennial Mental Health was inadequate because the treatment he received was not the type of dual diagnosis or trauma-specific treatment he needed. It is true that father was assigned to at least two different treatment providers at Centennial. But the record does not support his assertion that because he had two providers, he must not have been receiving dual diagnosis

10

treatment from a single provider. To the contrary, the caseworker testified that she did not refer father to separate providers for mental health and substance abuse treatment but instead referred him for dual diagnosis treatment. And she believed that one of the providers at Centennial was "geared toward his DUI classes," not the treatment required for this case. Notably, father's own expert admitted that he was just speculating, based on reviewing Centennial's records, that a single therapist was not providing father with dual diagnosis or trauma-specific treatment. Thus, nothing in the record indicates that father was not given the opportunity to attend dual diagnosis, trauma-specific treatment.

¶ 25      The record also does not support father's argument that he could not attend treatment because he had an outstanding bill at Centennial, and the Department failed to alleviate that barrier. When father told the caseworker he received a bill from Centennial, she called Centennial to determine whether the balance needed to be paid before he could go back to therapy. The caseworker found out that the outstanding bill was related to father's DUI classes and a lapse in his Medicaid benefits. The caseworker confirmed that father's Medicaid benefits were recertified and let him know that

although he had an unpaid bill for his DUI classes, he was able to start attending therapy again. After that, father called Centennial and scheduled some appointments. Nonetheless, even though father had access to treatment at Centennial throughout the case, he attended only seven therapy sessions and was discharged from treatment for lack of engagement on two occasions.

¶ 26 Next, we are not persuaded that the psychologist's recommendations prevented father from receiving appropriate treatment. In his evaluation, the psychologist noted that it is "difficult to complete an accurate mental health diagnosis when a parent is actively abusing substances" and stated that "until [father] is sober for at least six months, it will be difficult to separate" whether father's symptoms are the result of substance abuse or mental health issues. Contrary to father's assertion, the psychologist did not recommend that father should receive no mental health treatment until he had been sober for at least six months. Rather, the psychologist recommended, as his report indicates, that father engage in dual diagnosis treatment for substance abuse and mental health. Nothing in the record reveals that the Department waited to provide a referral for dual diagnosis

12

treatment until father showed sobriety. In fact, the record shows that the caseworker had already referred father to Centennial for dual diagnosis treatment before the psychological evaluation occurred and that the treatment was available to father throughout the case.

¶ 27    We also disagree with father's contention that the Department failed to make reasonable efforts to address his domestic violence issues. Contrary to father's assertions, although he contested the treatment plan objective requiring him to complete a psychological evaluation and comply with its recommendations, the juvenile court eventually adopted that objective as part of his treatment plan. Father did the evaluation, and one of the recommendations in the psychological evaluation was for father to "complete a domestic violence assessment and follow any recommendations for treatment or classes." The caseworker testified that she offered to refer father for a domestic violence assessment, but he declined. In fact, father testified that he was unwilling to do domestic violence treatment because he "didn't feel like [he] was guilty of doing domestic violence." *See People in Interest of A.V.*, 2012 COA 210, ¶ 12 (a juvenile court may consider a parent's unwillingness to participate

13

in treatment as a factor in determining whether a department made reasonable efforts).

¶ 28    Further, we reject father's argument that the Department did not make reasonable efforts because it did not provide an opportunity for him to attend family therapy with grandfather. The juvenile court found, and we agree, that it was "unclear" how family therapy with grandfather was necessary to render father fit. *See People in Interest of K.B.*, 2016 COA 21, ¶¶ 13, 16 (treatment plan objectives, which are "inextricably linked" to the services that should ultimately be provided, must be reasonably calculated to render a parent fit); *see also* § 19-3-208(2)(b), (d) (services must only be provided if they are determined to be "necessary and appropriate"). True, the psychologist recommended family therapy with grandfather if father was engaging with an individual therapist who could then determine when and if family therapy would be beneficial. But father's therapist had never recommended family therapy with grandfather. And the caseworker opined that family therapy with grandfather may have been beneficial, but only after father had "maintained" his own therapy and worked through some of "his own personal struggles." As noted above, father's

14

engagement in individual treatment throughout the case was minimal.

¶ 29 Last, we are not persuaded by father's argument that the Department's efforts were lacking because the caseworker did not visit and inspect father's home after he made safety improvements to it. The caseworker admitted that she only visited father's home one time and had informed both parents that the safety concerns would warrant a code inspector to determine what needed to be fixed to render the home safe. She also told the parents that the Department would pay for the code inspector. Instead, the parents decided to look for alternate housing, and the caseworker provided them with "many" housing resources. The parents did not utilize those resources. Nonetheless, the caseworker and the psychologist confirmed that addressing father's substance abuse, not the safety of the home, was the priority throughout the case. Therefore, the Department's prioritization of services related to substance abuse over services related to the safety of the home did not amount to a lack of reasonable efforts. *See People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33 (the department "retain[s] discretion to prioritize certain services or resources to address a family's most

pressing needs in a way that will assist the family's overall completion of the treatment plan).

¶ 30 Based on the foregoing, we discern no error in the juvenile court's determination that the Department made reasonable efforts to rehabilitate father and reunite him with the child.

## IV. Reasonable Accommodations

¶ 31 Mother contends that the Department knew she had a disability but failed to provide reasonable accommodations under the Americans with Disabilities Act (ADA). We are not persuaded.

### a. Applicable Law and Standard of Review

¶ 32 The ADA requires a public entity, such as a county department of human services, to make reasonable accommodations for qualified individuals with disabilities. *See People in Interest of C.Z.*, 2015 COA 87, ¶ 11; *see also* 42 U.S.C. § 12102 (defining "disability" under the ADA); 42 U.S.C. § 12111(8) (defining "qualified individual" under the ADA). Whether a parent is a qualified individual with a disability under the ADA requires a case-by-case determination. *People in Interest of S.K.*, 2019 COA 36, ¶ 21. Although a department must provide appropriate screening and assessments of a parent, the parent is

responsible for disclosing information regarding their disability. *Id.* And the parent should also identify any modifications that they believe are necessary to accommodate the disability. *Id.*

¶ 33 As relevant here, the ADA requires a department and the juvenile court to account for and, if possible, make reasonable accommodations for a parent's disability when providing rehabilitative services. *Id.* at ¶ 34. As a result, a juvenile court must consider whether a department made reasonable accommodations in determining if it made reasonable efforts to rehabilitate the parent. *Id.*

¶ 34 As noted above, we review the juvenile court's factual findings for clear error but review de novo its legal determination that a department made reasonable efforts to rehabilitate the parent. *A.S.L.*, ¶ 8.

## b. Analysis

¶ 35 At the termination hearing, the question of whether mother had a disability was disputed, and the juvenile court found that the "record [fell] short . . . of demonstrating that [mother] was a qualified individual with a disability as required by law." Still, the court found that when the Department identified mother as being

17

"lower functioning," the caseworker referred her for a psychological evaluation and then followed the psychologist's recommendations by providing "significant hands-on support" to her. The court also found that the Department provided numerous services to mother and that even if she had a disability, she had not identified any accommodations that she was "left wanting." Thus, the court concluded that the Department had made reasonable efforts to rehabilitate her and reunite her with the child.

¶ 36    The record supports the court's finding that mother did not establish that she had a qualifying disability. While both expert witnesses identified mother as either being on the "lower end of the average [cognitive] range" or having "mild cognitive impairment," neither opined that she had a disability. But, even assuming that mother had a qualifying disability, the record shows that the Department accommodated for her impairments, and we agree with the court's determination that the Department made reasonable efforts.

¶ 37    First, the Department provided "appropriate screening and assessments" to determine if mother needed accommodations for a disability. *See S.K.,* ¶ 21. The intake caseworker testified that

when she first met mother, she was concerned about mother's "functioning level" and possible "delays" but was unsure if those were caused by substance use or something else. Based on these concerns, the caseworker sent a referral for a psychological evaluation. After mother completed the evaluation, the ongoing caseworker contacted the psychologist, and he recommended further assessment through the community board to determine if mother qualified for services based on her adaptive functioning. When the caseworker reached out to a provider to set up an adaptive functioning assessment, they did not recommend an assessment until mother was sober because the results would be invalid if mother was actively using methamphetamine. Even so, the caseworker arranged for a provider from Eastern Colorado Services to attend a family engagement meeting, and the provider interviewed mother over the phone to discuss the possibility of services. But that provider determined that mother did not qualify for any of Eastern Colorado Services' programs because her intelligence quotient was too high. Although mother told the psychologist that she did not qualify for social security disability

19

benefits, the caseworker helped mother fill out a social security application.

¶ 38    Next, the caseworker provided hands-on support to mother, as recommended by the psychologist.  For example, she gave mother a planner with several months of appointments already written in it.  She also gave mother several rides to family time, inpatient treatment, domestic violence services, and into town to do her laundry.  As noted above, the caseworker helped mother fill out applications for services.  When mother would call and was upset, the caseworker provided emotional support and asked what she could do to help.  In fact, when asked what the Department had done to help her comply with her treatment plan, mother testified that "when it comes down to it, like when I need something, I can call [the caseworker]."

¶ 39    Last, the Department provided mother with numerous resources and services that were reasonably calculated to help her complete her treatment goals and render her fit.  Specifically, the Department provided mother with parenting coaching classes, referred her to dual diagnosis treatment, set up sobriety monitoring, referred her for a psychological evaluation and parent-child

interactional assessment, offered her inpatient treatment and transportation to get there, provided her with supervised and therapeutic family time, helped her access domestic violence services, provided her with housing resources and utilities assistance, purchased several cell phones for her, and provided her with gas vouchers and bus tickets.

¶ 40 On appeal, mother lists additional services she believes the Department should have provided and argues that these services were required to accommodate her disability. But the record does not indicate that mother asked for these additional services at any point throughout the case. *See id.* at ¶ 21 (a parent should identify any modifications that she believes are necessary to accommodate her disability); *see also People in Interest of S.Z.S.*, 2022 COA 133, ¶ 17 (waiting until the termination hearing to raise the ADA issue is "problematic" because the department cannot provide, and the court cannot order the department to provide, reasonable accommodations to rehabilitate the parent during the case).

¶ 41 Based on the foregoing, we agree with the juvenile court's determination that the Department considered and reasonably accommodated for mother's level of cognitive functioning. Thus, we

discern no error in the court's finding that the Department made reasonable efforts to rehabilitate her and reunite her with the child.

## V. Less Drastic Alternatives

¶ 42 Both parents contend that the juvenile court erred by finding that there were no less drastic alternatives to termination. Specifically, they argue that the court improperly ruled out an allocation of parental responsibilities (APR) to paternal grandmother or grandfather. We disagree.

### a. Applicable Law and Standard of Review

¶ 43 The consideration and elimination of less drastic alternatives are implicit in the statutory criteria for termination. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 40. In considering less drastic alternatives, a juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29. A juvenile court may also consider other factors, including whether an ongoing relationship with a parent would be beneficial to the child, which is influenced by a parent's fitness to care for the child's needs. *People in Interest of A.R.*, 2012 COA 195M, ¶ 38.

And a juvenile court may consider whether the placement favors adoption over an APR. *Z.M.*, ¶ 31.

¶ 44 To aid the court in determining whether there is a less drastic alternative to termination, the department must evaluate a reasonable number of persons the parent identifies as placement options. *People in Interest of D.B-J.*, 89 P.3d 530, 532 (Colo. App. 2004). But the department is not obligated to "independently identify and evaluate other possible placement alternatives." *People in Interest of Z.P.*, 167 P.3d 211, 215 (Colo. App. 2007).

¶ 45 For a less drastic alternative to be viable, it must do more than adequately meet the child's needs; it must be in the child's best interests. *A.M.*, ¶ 27. Long-term or permanent placement with a family member, short of termination, may not be in the child's best interests if it does not provide the permanence that adoption would provide or otherwise meet the child's needs. *A.R.*, ¶ 41. If a juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the alternative and order termination. *A.M.*, ¶ 32.

¶ 46 "We review a juvenile court's less drastic alternatives findings for clear error." *People in Interest of E.W.*, 2022 COA 12, ¶ 34.

Accordingly, when a juvenile court considers a less drastic alternative but instead finds that termination is in the child's best interests, we are bound to affirm the court's decision so long as the record supports its findings and legal conclusions. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

### b. Analysis

¶ 47 The juvenile court considered whether there were any less drastic alternatives to termination that would be in the child's best interests but ultimately determined there were not. In particular, the court found that an APR to grandmother was not a viable option because she was unwilling to acknowledge or recognize father's shortcomings, which created a safety issue for the child. The court also found that an APR to grandfather, with whom the child was placed, was not a viable option because father had been abusive toward grandfather and had taken no accountability for the deterioration of their relationship.

¶ 48 The record supports these findings. The intake caseworker testified that when the case opened, she conducted a diligent search to identify family members and reached out to several of them to discuss the possibility of placement. At that time, the caseworker

24

determined that the child should not be placed with grandmother because a juvenile sex offender was living with grandmother, and she would not acknowledge that the parents' drug use or the conditions of their home were unsafe for the child. At the time of the termination hearing, the ongoing caseworker testified that she still had safety concerns because she believed that grandmother would allow the child to be around father "no matter what condition [father] was in." Indeed, grandmother testified that she had never had any concerns that either parent was under the influence of any substances and still did not think that the parents needed to be supervised around the child.

¶ 49    Next, the caseworker testified that when father requested a meeting with grandfather at the Department, she set one up. But at that meeting, she observed father yelling, cursing, and talking over grandfather while grandfather remained calm and tried to encourage father to work on his treatment plan. Grandfather testified that he preferred adoption over APR because he had obtained a protection order against father, which was the result of father's anger, hostility, and disrespect toward him and his wife throughout the proceedings.

¶ 50    It is true, as mother points out, that the juvenile court focused on father's relationship with grandfather when determining whether an APR to grandfather was a viable option.  But the record does not support her argument that the court should have ordered an APR between her and grandfather because their relationship was good.  Rather, according to the caseworker, mother's relationship with grandfather was "conflicted" and there were times when mother was "very much against" grandfather and his wife.  Additionally, the caseworker opined that an APR between mother and grandfather would not be in the child's best interests because mother's relationship with father would render that situation unsafe for the child.  Indeed, mother testified that her relationship with father was "poisonous or dangerous," that father "called the shots" in the relationship, and that she would not go visit the child at grandfather's house if father was not allowed to go with her.

¶ 51    Moreover, the caseworker opined that termination, not an APR, was in the child's best interests because it would not be safe for the child to continue to experience the "kind of harassment and hostility" that father directed toward grandfather and because the child needed the predictability it would provide.  The caseworker

26

also opined that termination, and eventual adoption would provide permanency, which is what the child needed.

¶ 52 Therefore, because the record supports the juvenile court's finding that termination, not an APR, was in the child's best interests, we discern no basis for reversal.

## VI. Disposition

¶ 53 The judgment is affirmed.

JUDGE GROVE and JUDGE LUM concur.